49 P.3d 947 (2002)
112 Wash.App. 428
Charles A. PILCHER, M.D., Appellant,
v.
STATE of Washington, Department of Revenue, Respondent.
No. 27043-9-II.
Court of Appeals of Washington, Division 2.
July 2, 2002.
*948 George Carl Mastrodonato, Lane Powell Spears Lubersky, Olympia, Michael Barr King, Lane Powell Spears Lubersky, Seattle, for Appellant.
Anne Elizabeth Egeler, Cameron Gordon Comfort, Assistant Attorneys General, for Respondent.
Dirk Jay Giseburt, Settle, for Amicus Curiae.
HUNT, C.J.
Dr. Charles A. Pilcher appeals a judgment for the Washington Department of Revenue (Department) in his business and occupation (B & O) tax refund action. He argues that the Department wrongfully required him to pay B & O tax on that portion of his gross receipts from Evergreen Hospital that he had paid to the physicians he hired to staff the hospital's emergency department. We hold that (1) substantial evidence supports the trial court's findings of fact, and (2) Pilcher's payments to the physicians under his contract with Evergreen are not excludable from income as pass-through payment exemptions. We affirm.

FACTS
Evergreen Hospital (the Hospital) provides emergency services to patients through its emergency department. Evergreen contracts out its emergency department physician services, rather than hire the necessary emergency room physicians itself.

I. EMERGENCY SERVICES CONTRACTS

A. HOSPITALPILCHER CONTRACT
Dr. Pilcher is a licensed physician and Certified Specialist in Emergency Medicine. During the 1986-89 audit period at issue here, he contracted with the Hospital (the Hospital/Pilcher contract) to serve as Medical Director and as the providing physician for the Hospital's emergency department.[1]
As part of the Hospital/Pilcher contract, Dr. Pilcher agreed that he "or one or more of his agents or employees, shall be in attendance and on duty as a physician in the emergency department of the Hospital at all times, so as to provide the Hospital 24-hour on-duty coverage." Clerk's Papers (CP) at 662 (Finding 5.1). Because it would be physically impossible for Dr. Pilcher to be on duty 24 hours a day, seven days a week, CP *949 at 664 (Finding 6), the Hospital agreed that Dr. Pilcher could "from time to time associate competent, licensed, physicians or associates, in his sole discretion[.]" CP at 664 (Finding 5.10).
The Hospital/Pilcher contract provided that (1) the relationship of Dr. Pilcher "and his agents and employees to the Hospital shall be that of an independent contractor," CP at 209, and (2) neither he "nor his employees or agents shall be deemed employees of the hospital for any purpose whatsoever...." CP at 209. The contract held Dr. Pilcher directly responsible if the medical care rendered by the physicians he retained was not consistent with the hospital's "intent of supplying a high degree of quality medical care." CP at 663 (Finding 5.5). The contract further provided that "failure to maintain said quality care and failure to correct the situation will constitute a breach by the Doctor [Pilcher]." CP at 212.

B. PILCHER-INDEPENDENT
PHYSICIANS CONTRACTS
Dr. Pilcher hired at least five other physicians to work in the Hospital's emergency department. He prepared and required each physician to sign a contract (Pilcher/physician contract),[2] specifying the terms of their relationship. None of these physicians entered into contracts with the Hospital for emergency room services.[3] Rather, the physicians worked as "independent contractor[s] to [Dr. Pilcher]," CP at 221, and Dr. Pilcher could terminate the physicians as he saw fit.
Under the Pilcher/physician contracts, each retained physician acknowledged that Dr. Pilcher was "responsible for all administrative matters pertaining to their practices in the Emergency Department." CP at 665 (Finding 7.4).[4] Each agreed, however, to accept delegated administrative assignments by Dr. Pilcher "for the benefit of [individual] professional growth or of the department as a whole." CP at 222.

C. EMERGENCY ROOM FEES
Under the Hospital/Pilcher contract,
Charges for the professional services rendered by [Dr. Pilcher] pursuant to this agreement shall be made on a fee-for-service basis ... in accordance with a fee schedule to be prepared by [Dr. Pilcher] and approved in advance by the Hospital.
CP at 212. On a monthly basis, Dr. Pilcher and his retained physicians submitted their emergency services fees for the Hospital to bill its patients.[5] Dr. Pilcher, his retained physicians, and the Hospital agreed that all of the emergency room physicians' submitted "charges shall be considered the gross charges by [Dr. Pilcher] during that one-month period." CP at 214. Once a month, the Hospital compensated Dr. Pilcher by paying him the charges he and his retained physicians had submitted to the Hospital, "less 18.7 percent thereof for costs of collection, billing, and general overhead."[6] CP at 664, Finding 5.7.
The Evergreen/Pilcher contract provided that Dr. Pilcher was solely responsible for paying the physicians he retained:
[Dr. Pilcher] shall be exclusively responsible for the payment of all wages and salaries ... and the filing of all necessary documents, forms and returns pertinent to all of the foregoing. In the event that [Dr. Pilcher] fails to make any such payment or filing, he shall hold harmless and provide *950 the Hospital with a defense against any and all claims that the Hospital is responsible for such payment or filing.
CP at 218 (emphasis added). This provision fairly reflected the actual relationship and practices of the Hospital and Dr. Pilcher.
The physicians Dr. Pilcher retained likewise acknowledged in their contracts that Dr. Pilcher was exclusively responsible for paying them.[7] The amount of their compensation was strictly between Dr. Pilcher and the individual physicians. Under the Pilcher/physician contracts, Dr. Pilcher paid each physician his or her total billed charges for providing emergency department medical services each month, "less 22.7 percent."[8] If for some reason the physicians were not paid, the Hospital "would have expected Dr. Pilcher to resolve the issue." Report of Proceedings (RP) at 216.

II. AUDIT
The Washington Department of Revenue audited Dr. Pilcher and determined that (1) he had underreported payments he received from the Hospital; (2) "[t]he difference was the amounts deducted which represented amounts [Dr. Pilcher] paid to other physicians which [he] subcontracted with to staff the emergency room in [his] absence"; CP at 637, and (3) WAC 458-20-111 (Rule 111)[9] did not apply or allow an exemption. The Department assessed additional business and occupation (B & O) taxes of $49,166, plus statutory interest.
Dr. Pilcher filed an administrative appeal with the Department's Appeals Division, which upheld the Department's assessment. Dr. Pilcher paid the assessment, then filed for a refund. He next appealed to the Board of Tax Appeals (BTA), which also upheld the Department's assessment.[10] Dr. Pilcher filed a de novo, excise-tax-refund appeal under RCW 82.32.180, and the parties had a bench trial in Thurston County Superior Court.
Dr. Pilcher admitted that the Hospital had issued I.R.S. Forms 1099 to him that "include[d] the gross income or the gross amount that was paid to [him]," RP at 64-65, which gross amounts he reported as his gross income for federal income tax purposes. On his federal income tax return, Dr. Pilcher also deducted, as a business expense (labor cost), the amounts he paid to the physicians he retained to staff the Hospital's emergency department "[b]ecause [he] was entitled to it." RP at 154.
In a letter opinion denying Dr. Pilcher's refund claim, the trial court stated:
This court will uphold the Board of Tax Appeal decision. Dr. Pilcher was the sole contracting agent with Evergreen Hospital and ultimately responsible for the hiring and firing of the contracting ER physicians. Although he considered himself a conduit for all the physicians and in practice the ER physicians made decisions as a group, by the terms of the contract with Evergreen, Dr. Pilcher could have overridden their collective decisions. The court is not persuaded that the practice overrides the clear and unambiguous terms of the contract.
CP at 640. The trial court filed findings of fact and conclusions of law consistent with its letter opinion, and entered judgment in the Department's favor, from which Dr. Pilcher now appeals.

ANALYSIS

I. STANDARD OF REVIEW
"[C]hallenged findings will be binding on appeal if they are supported by substantial *951 evidence in the record." In the Matter of the Contested Election of Schoessler, 140 Wash.2d 368, 385, 998 P.2d 818 (2000) (citation omitted). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." Schoessler, 140 Wash.2d at 385, 998 P.2d 818 (citation omitted).
On appeal, we view the evidence in the light most favorable to the prevailing party. Bennett v. Dep't of Labor & Indus., 95 Wash.2d 531, 534, 627 P.2d 104 (1981). Under the substantial evidence standard, we "will not substitute our judgment for that of the fact finder. Instead, [this Court] accept[s] the fact finder's views regarding the credibility of witnesses and the weight accorded to reasonable but competing inferences." Isla Verde Intl Holdings, Inc. v. City of Camas, 99 Wash.App. 127, 133-34, 990 P.2d 429 (1999), review granted, 141 Wash.2d 1011, 10 P.3d 1071 (2000) (citation omitted).

II. BUSINESS & OCCUPATION TAX LIABILITY
Dr. Pilcher argues that any doubt as to the imposition of a tax must be resolved in his favor and that the trial court's decision in favor of the Department is not sustainable in light of controlling case law.

A B & O TAX IMPOSITION
The B & O tax applies to virtually all business activities conducted in this state. Simpson Inv. Co. v. Dep't of Revenue, 141 Wash.2d 139, 149, 3 P.3d 741 (2000). RCW 82.04.220 provides, in pertinent part:
Business and occupation tax imposed.
There is levied and shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against ... gross income of the business....
(Emphasis added.) RCW 82.04.080 defines "gross income of the business" as:
[T]he value proceeding or accruing by reason of the transaction of the business engaged in and includes gross proceeds of sales, compensation for the rendition of services, gains realized from trading in stocks, bonds, or other evidences of indebtedness, interest, discount, rents, royalties, fees, commissions, dividends, and other emoluments however designated, all without any deduction on account of the cost of tangible property sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes, or any other expense whatsoever paid or accrued and without any deduction on account of losses.
(Emphasis added.) Under this broad definition, a service provider may not deduct any of its own costs of doing business, including its labor costs, from its gross income. Rho Co., Inc. v. Dep't of Revenue, 113 Wash.2d 561, 566-67, 782 P.2d 986 (1989).
Under the Evergreen/Pilcher contract, Dr. Pilcher was in the business of providing services to Evergreen: his management services and the services of the physicians he hired as his independent contractors to help staff the emergency room. He was not entitled to deduct his labor costs or any other expenses related to his business before paying the B & O tax on the gross income he received from the Hospital as compensation for his services. That the amount of his compensation was dependent on the hours of emergency room services that his physicians provided does not entitle him to deduct the amounts he paid them for performing those services.
Dr. Pilcher argues broadly that fees earned by other physicians for treatment they provided to patients "obviously did not constitute compensation paid to [him] for services he rendered to patients and therefore did not belong to [him] and were neither "received" nor "accrued" (RCW 82.04.090) by him," citing Walthew, Warner, Keefe, Arron, Costello & Thompson v. Dep't of Revenue, 103 Wash.2d 183, 691 P.2d 559 (1984). In Walthew, the court found that a law firm was not liable for B & O tax on the firm's advances to third party service providers for services that the firm itself did not provide, such as court reporters and expert witnesses, when acting solely as an agent for the client and a conduit for such payments, which fell *952 within the exemption of WAC 458-20-111 (Rule 111).
But such is not the case here. First, unlike in Walthew, Dr. Pilcher was not acting solely as an agent for the physicians he hired to staff the Hospital's emergency room; on the contrary, the contracts specifically stated that he was not their agent. Second, Dr. Pilcher was not acting solely as a pass-through for payments from the Hospital to the physicians; rather, under their contracts, Dr. Pilcher could pay the physicians any amount they agreed upon, independent of what the Hospital paid him. Thus, unlike in Walthew, Dr. Pilcher was not entitled to a Rule 111 exemption.

B. RULE 111 B & O TAX EXEMPTION
Although a taxpayer may not deduct business costs from its gross income for B & O tax purposes, at times in the regular course of business, a taxpayer may receive money to pay costs that are its client's obligation. The Department has promulgated WAC 458-20-111 (Rule 111) to distinguish between (1) those instances when a taxpayer receives payment for services provided or work performed, and (2) those instances when a taxpayer receives money to use for a "pass through" payment to satisfy its client's obligation. Rule 111 provides in pertinent part:
Advances and reimbursements.
The word "advance" as used herein, means money or credits received by a taxpayer from a customer or client with which the taxpayer is to pay costs or fees for the customer or client. The word "reimbursement" as used herein, means money or credits received from a customer or client to repay the taxpayer for money or credits expended by the taxpayer in payment of costs or fees for the client.
. . . .

The words "advance" and "reimbursement" apply only when the customer or client alone is liable for the payment of the fees or costs and when the taxpayer making the payment has no personal liability therefor, either primarily or secondarily, other than as agent for the customer or client.
There may be excluded from the measure of tax amounts representing money or credit received by a taxpayer as reimbursement of an advance in accordance with the regular and usual custom of his business or profession.
The foregoing is limited to cases wherein the taxpayer, as an incident to the business, undertakes, on behalf of the customer, guest or client, the payment of money, either upon an obligation owing by the customer, guest or client to a third person, or in procuring a service for the customer, guest or client which the taxpayer does not or cannot render and for which no liability attaches to the taxpayer. It does not apply to cases where the customer, guest or client makes advances to the taxpayer upon services to be rendered by the taxpayer or upon goods to be purchased by the taxpayer in carrying on the business in which the taxpayer engages.
WAC 458-20-111 (emphasis added).
Our Supreme Court has adopted a three-part test to determine whether a payment received by a taxpayer qualifies as a "pass through" payment under Rule 111:(1) "[T]he repayments received by the taxpayer must be reimbursements or advances made as part of the regular and usual custom of the taxpayer's business or profession"; (2) "the payments made by the taxpayer to associate firms are for services that the taxpayer does not or cannot render"; and (3) "the taxpayer is not liable for paying the associate firms except as the agent of the client." Christensen, O'Connor, Garrison & Havelka v. Dep't of Revenue, 97 Wash.2d 764, 769, 649 P.2d 839 (1982).
Dr. Pilcher relies on Christensen, and subsequent cases,[11] to argue that Rule 111 *953 supports a deduction or exemption for the payments he made to the physicians he retained for the emergency room.[12] But the facts do not support a Rule 111 exemption for Dr. Pilcher, nor do they support that Dr. Pilcher, the Hospital, and sub-contracting physicians contradicted the stated terms of their respective contracts in actual practice.

1. Advances or Reimbursements for Clients
Under the first part of the Christensen test, Dr. Pilcher had to prove that the Hospital's payments to him were "advances or reimbursements." But the record supports the trial court's finding that these payments were neither advances nor reimbursement for the monies he owed his retained physicians. Rather, the record shows that the Hospital made these payments exclusively to Dr. Pilcher for providing medical coverage and management for the Hospital's emergency department.
It is undisputed that the Hospital purposefully chose to contract for emergency services solely with Dr. Pilcher. The Hospital's only legal obligation was to Dr. Pilcher. The Hospital had no separate contract with the physicians Dr. Pilcher retained. Dr. Pilcher had no authority to enter into contracts on the Hospital's behalf. Dr. Pilcher was solely liable for paying the physicians. In effect, the Hospital was purchasing physician services and management from Dr. Pilcher.
The record further reflects that Dr. Pilcher did not pay his retained physicians until after they performed their services, after he submitted the charges to the Hospital, and after he received his monthly payment from the Hospital. Thus, such payments from the Hospital to Dr. Pilcher were neither advancements to him nor reimbursements for money he had paid his emergency room physicians.
The trial court did not err in concluding that Dr. Pilcher failed the first prong of the test. Rather, the evidence supports its conclusion that "the payments Pilcher received from Evergreen were for the professional services he rendered to the Hospital under the Evergreen/Pilcher contract," and they were neither advances nor reimbursements. CP at 669 (Conclusions 9-10).

2. Payments for Services the Taxpayer Did Not or Could Not Render
The trial court concluded,
Regarding the second prong of the Christensen test, Pilcher rendered the professional services required by the Evergreen/Pilcher contract either personally or through his physician subcontractors. Pilcher thus did not receive payments from Evergreen for services which he did not or could not render.
CP at 669. The Hospital agreed to pay Dr. Pilcher for "professional medical coverage" and for serving as the emergency department's medical director. The Hospital's intent in entering into the contract with Dr. Pilcher was to have "one individual to hold accountable for the services provided in the Emergency Department." CP at 662, Finding 4 (emphasis added). Although the Hospital/Pilcher contract contemplated that Dr. Pilcher would provide some emergency medical coverage through hired associate physicians, those associates clearly worked for Dr. Pilcher; only he entered into contracts with them.
In contrast, the Hospital specified in the Hospital/Pilcher contract that it would "not negotiate with any of the other emergency room physicians, for the use of their services during the term of this contract." CP at 215 (emphasis added). If the Hospital was displeased with the quality of care provided by any of Dr. Pilcher's retained physicians, he was responsible to correct the problem or he would be in breach of his contract with the Hospital. He alone was responsible for firing the offending physician, if required, and finding a replacement.
The trial court did not err in finding that Dr. Pilcher failed the second prong of the *954 test; the services for which the Hospital paid him were for services that he could and did provide.

3. Taxpayer Liable Only as Agent of Client
The third part of the Christensen test specifies that Dr. Pilcher must not be liable for the money in issue, "except as the agent of the client." On this point, the trial court concluded that Dr. Pilcher was solely responsible for paying the physicians he retained, regardless of whether the Hospital paid him or whether the patients paid the Hospital. The trial court's findings of fact, and the evidence in the record on which those finding are based, support this conclusion. The Hospital/Pilcher contract stated, "[Dr. Pilcher] shall be exclusively responsible for the payment of all wages and salaries...." CP at 218. In practice, the Hospital did not pay Dr. Pilcher for only those charges that had already been collected by the patients; rather, it paid him the gross amount he billed each month, less 18.7 percent, which represented the Hospital's projected costs for collection, billing, and general overhead. The trial court did not err in concluding that Dr. Pilcher failed the third prong of the Christensen test because his liability was not solely that of an agent.
Substantial evidence in the record supports the trial court's findings, and those findings, in turn, support the trial court's conclusions of law and judgment in this case. On appeal Dr. Pilcher continues to argue another meaning of the evidence presented; but in so doing, he is asking us to make credibility determinations that we cannot properly make because to do so would supercede the judgment of the trier of fact.
Under the statutes, Dr. Pilcher is liable for B & O tax on the gross income that he received from the Hospital, without any deduction for his costs for hiring the extra emergency room physicians. He does not qualify for an exemption under Rule 111 because he fails one or more prong of the Christensen test. The Department properly denied his refund.
Affirmed.
We concur: SEINFELD and ARMSTRONG, JJ.
NOTES
[1] The Hospital's strategy was that its emergency department could be "managed most efficiently and effectively if medical direction and professional services are provided by a single responsible individual." CP at 662 (Finding 4). The Hospital wanted to ensure accountability by having "Dr. Pilcher be solely responsible for the provision of emergency physician services." Report of Proceedings (RP) at 176. The Hospital understood that it was entering into a contract solely with Dr. Pilcher and did not think that Dr. Pilcher was representing other parties. CP at 297.
[2] The Hospital had no role in drafting or signing these contracts; nor did Dr. Pilcher have authority to enter into contracts on the Hospital's behalf. Rather, it was solely Dr. Pilcher's obligation to supply the physicians sharing the emergency department's workload. Thus he, not the Hospital, contracted with the emergency room physicians.
[3] The Hospital expressly agreed with Dr. Pilcher that it would not negotiate with any physician whom he retained for emergency services.
[4] The Hospital/Pilcher contract likewise provided: "The Doctor [Pilcher] shall be responsible for all administrative matters appertaining to his physician agents and employees." CP at 211.
[5] Emergency department patients were not informed of the nature of the relationships between the Hospital, Dr. Pilcher, and the physicians whom Dr. Pilcher retained to provide services.
[6] The Hospital's payments to Dr. Pilcher did not depend on the hospital's first receiving payments from the emergency department's patients or their insurers.
[7] Regarding the Hospital/Pilcher contract provision that Dr. Pilcher "shall be exclusively responsible for the payment of all wages and salaries...," the Pilcher/physician contracts noted: "As an independent contractor, you agree to file all necessary forms and pay all amounts for which you might be liable as provided in this paragraph." CP at 218; CP at 223.
[8] Evergreen did not restrict Dr. Pilcher with respect to what he paid the physicians or the amount he retained as his administrative fee.
[9] WAC 458-20-111 excludes certain "pass through" payments from gross income.
[10] Attachment # 1 to Respondent's Brief indicates the BTA agreed that Dr. Pilcher provided services as an independent contractor to the Hospital and not solely as the agent of the other emergency department physicians for collection of fees; the BTA sustained the Department's assessment of B & O tax. See Pilcher v. Dep't of Revenue, Docket No. 46920 (August 23, 1996).
[11] Walthew, 103 Wash.2d at 183, 691 P.2d 559 (law firm not taxable on reimbursements for some litigation expenses that firm paid and client ultimately remained liable for); Rho, 113 Wash.2d at 561, 782 P.2d 986, (wages paid temporary workers excludable only if obligation to pay resulted solely from capacity as an agent for the clients); Med. Consultants N.W., Inc. v. State, 89 Wash.App. 39, 947 P.2d 784 (1997), review denied, 136 Wash.2d 1002, 966 P.2d 901 (1998) (services that cannot be performed by the taxpayer, but rather taxpayer contracted for on behalf of client who remains liable for payment, not taxable to the taxpayer).
[12] He also cites case law for the proposition that "substance rather than form should be used to assess tax classifications." Brief of Appellant at 32-33; see First Am. Title Ins. Co., v. Dep't of Revenue, 144 Wash.2d 300, 27 P.3d 604 (2001); Time Oil Co. v. State, 79 Wash.2d 143, 146, 483 P.2d 628 (1971).