96 P.3d 460 (2004)
William and Gail WEYERHAEUSER, Plaintiffs,
v.
TACOMA-PIERCE COUNTY HEALTH DEPARTMENT; Land Recovery, Inc.; Resource Investment, Inc.; Norman Lemay, Defendants.
Concerned Residents on Waste Disposal, Appellant/Cross-Respondent,
v.
Tacoma-Pierce County Health Department, Respondent,
Land Recovery, Inc.; Resource Investments, Inc.; Norman Lemay, Respondents/Cross-Appellants.
No. 29622-5-II.
Court of Appeals of Washington, Division 2.
August 24, 2004.
*461 Robert Eugene Mack, Barbara Anne Henderson, Smith Alling Lane, Tacoma, WA, for Appellant.
*462 Steven Snarkson Anderson, Daniel David Syrdal, Heller Ehrman White & McAuliffe LLP, Seattle, WA, for Respondents.
BRIDGEWATER, J.
Concerned Residents on Waste Disposal (CROWD) appeals from a declaratory judgment in favor of Land Recovery Inc. (LRI) and the Tacoma-Pierce County Health Department (TPCHD) concerning the application of Substitute Senate Bill (SSB) 5729 to the construction of a landfill. We hold that the trial court correctly construed the phrase "landfill facility" and the term "construction." We also hold that LRI's activities in drilling permanent wells in 1998, prior to bill's passage on April 27, 1999, constituted "construction" such that LRI was not a "wholly new solid waste landfill" facility and was exempt from regulation under this provision. We affirm.
This case revolves around the construction of a landfill on a 320-acre site at 304th Street and State Route (SR) 161 in Pierce County. Prior to constructing the landfill, respondent, LRI, was required to obtain a solid waste permit, a conditional use permit, and a site development permit. In February 1996, LRI received a solid waste permit from TPCHD pursuant to chapter 70.95 RCW[1] and WAC 173-351. The permit authorizes LRI to accept municipal and non-municipal solid waste for disposal. Under the permit, LRI must submit four copies of the final construction design drawings, construction specifications, and the construction quality assurance manual at least 60 days prior to beginning construction of each new cell,[2] the environmental monitoring systems, or the landfill's ancillary facilities. In addition, LRI may not begin construction until TPCHD has approved the required documents in writing.
Under Section VII of the permit, LRI must maintain a ground water monitoring system. The permit states:
a. The ground water monitoring system shall consist of ten wells (two background wells MW-9 and MW-10 and eight downgradient wells MW-1 through MW-8) installed within the shallow, Vashon Outwash, aquifer. Existing wells MW-9, MW-10, MW-7 ... and MW-6 ... will be included in the monitoring network. Six new wells (MW-1 through MW-5 and MW-8) shall be installed by LRI within the upper 20 feet of the Vashon Outwash aquifer.
b. Downgradient monitoring wells MW-1 through MW-4 shall be installed for the development and utilization of Cell 1.
Ex. 1 at 11. The permit also requires LRI to implement a wetlands mitigation and monitoring plan.
LRI also received its conditional use permit in early 1996. Under this permit, LRI must create a buffer zone around the active area of the landfill so that no active area will be closer than 250 feet to any property line abutting a residential use or zone classification. In addition, LRI is required to landscape around the landfill to prevent the blowing of litter; minimize noise, dust, and nuisance; and enhance the landscape's visual appearance. The permit also requires LRI to submit a financial guarantee to the county prior to the issuance of a site development permit. Both permits were challenged and upheld in March 1997 by Pierce County Superior Court. See Ex. 235 (Weyerhaeuser v. Pierce County, No. 96-2-08494-3).
In November 1998, LRI installed downgradient monitoring wells MW-1 through MW-4. On November 18, 1998, Andy Comstock, an environmental health specialist with TPCHD, granted LRI written approval to relocate MW-1. At trial, Comstock testified that LRI was not required to submit four copies of the final construction design drawings, construction specifications, and the construction quality assurance manual before constructing the monitoring wells because LRI was directed and authorized to construct the wells under Section VII of its Solid Waste Permit. Comstock also stated that his written approval to LRI to relocate MW-1 provided authorization to construct the *463 wells. Additionally, Comstock testified that while most of the wells were installed for pre-construction site characterization, MW-1 through MW-4 were not installed as part of the site characterization work. Rather, these wells were a permanent part of the monitoring network and were "brand-new wells specifically for monitoring downgradient compliance monitoring for the landfill unit itself." I Report of Proceedings (RP) (Aug. 22, 2001) at 94.
In addition, LRI began planting trees and landscaping at the site on March 26, 1999, and began silt fencing and erosion control in accordance with its wetlands mitigation plan on April 15, 1999. The following week, LRI began construction of a wetlands nursery by clearing the area of trees.
On April 27, 1999, at 4:15 P.M., SSB 5729 was signed into law, amending RCW 70.95.060, the section of the solid waste statute that authorizes the Department of Ecology to promulgate regulations establishing minimum functional standards for solid waste facilities. The bill contains an emergency clause, making it effective immediately.
SSB 5729 provides in relevant part:
(1) The department ... shall adopt ... rules establishing minimum functional standards for solid waste handling ..., consistent with the standards specified in this section.

(2) In addition to the minimum functional standards adopted by the department... each landfill facility whose area at its design capacity will exceed one hundred acres and whose horizontal height at design capacity will average one hundred feet or more above existing site elevations shall comply with the standards of this subsection. This subsection applies only to wholly new solid waste landfill facilities, no part or unit of which has had construction commence before the effective date of this section.

(a) No landfill specified in this subsection may be located:

(i) So that the active area is closer than five miles to any national park or a public or private nonprofit zoological park displaying native animals in their native habitats; or

(ii) Over a sole source aquifer designated under the federal safe drinking water act, if such designation was effective before January 1,1999.

Ex. 277 (emphasis added).
On May 7, CROWD and William and Gail Weyerhaeuser filed petitions for a declaratory judgment that SSB 5729 applied to the LRI landfill because it was located over a sole source aquifer and within five miles of Northwest Trek, a zoological park, and because "construction" had not yet commenced at the landfill site. I Clerk's Papers (CP) at 17. The trial court denied their petition, holding that SSB 5729 did not apply to the LRI landfill because construction activity occurred prior to the bill's passage. Specifically, the court held that LRI's construction of MW-1 through MW-4; landscaping and planting; silt fencing and erosion control; and beginning construction of the wetlands nursery constituted "construction" under the bill.

ANALYSIS
CROWD argues that there is insufficient evidence to support the trial court's findings of fact and conclusions of law. CROWD also assigns error to the court's order denying its motion for reconsideration, entered October 14, 2002. Based upon our review of the record, we hold that substantial evidence supports the trial court's findings of fact and conclusions of law.
In reviewing a trial court's findings and conclusions, we must determine whether substantial evidence supports challenged findings of fact and, in turn, whether the findings support the conclusions of law. Pilcher v. State Dep't of Revenue, 112 Wash. App. 428, 435, 49 P.3d 947 (2002), review denied, 149 Wash.2d 1004, 67 P.3d 1096 (2003). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding. Pilcher, 112 Wash.App. at 435, 49 P.3d 947. On appeal, we view the evidence in the light most favorable to the prevailing party. Pilcher, 112 Wash.App. at 435, 49 P.3d 947. *464 Additionally, we defer to the trier of fact regarding witness credibility or conflicting testimony. Pilcher, 112 Wash.App. at 435, 49 P.3d 947.

I. Statutory Construction
Our Supreme Court has recently held that, when engaging in statutory construction, our primary objective is to ascertain and give effect to the intent and purpose of the legislature in creating the statute. Am. Cont'l Ins. Co. v. Steen, 151 Wash.2d 512, 518, 91 P.3d 864 (2004). First, we must attempt to derive legislative intent from the statute itself, and if the statute is clear on its face, its meaning must be ascertained from that language. Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864. In addition, legislative definitions included in the statute are controlling. Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864. But in the absence of a statutory definition, we give the term its plain and ordinary meaning ascertained from a standard dictionary. Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864.
A statute is ambiguous if it can be reasonably interpreted in more than one way. Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864. However, it is not ambiguous simply because different interpretations are conceivable. Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864. We are not to search for "an ambiguity by imagining a variety of alternative interpretations." Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864 (citing W. Telepage, Inc. v. City of Tacoma Dept. of Fin., 140 Wash.2d 599, 608, 998 P.2d 884 (2000)).
An unambiguous statute is not subject to judicial construction, and we will not add language to an unambiguous statute even if we believe the legislature intended something else but did not adequately express it. Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864. If a statute is ambiguous, we resort to principles of statutory construction, legislative history, and relevant case law to assist in interpreting it. Am. Cont'l, 151 Wash.2d at 518, 91 P.3d 864.

A. "Landfill Facility"
CROWD first contends that the trial court erred in finding that the phrase "landfill facility," as contemplated in SSB 5729, encompassed not only the "active" areas of the landfill, but also the entire LRI landfill facilityincluding its environmental monitoring systems, buffer zone, and wetlands. Specifically, CROWD argues that the trial court defined the phrase "landfill facility" inconsistently in its findings of fact and conclusions of law because it used the phrase "landfill facility" when relating to the issue of "construction" to mean the entire facility, whereas it used the term "landfill facility" to mean only the "active" area when it measured the average "horizontal height at design capacity." However, CROWD's argument is immaterial in light of our interpretation of the statute.
CROWD also contends that the trial court should have construed the phrase "landfill facility" in accordance with the definition of "landfill" under former RCW 70.95.030(12) (2002)[3] and, if it had, it could not have found that "construction" of the landfill had commenced because LRI had not yet begun constructing the "active" portions of the landfill. CROWD is in error.
Under former RCW 70.95.030(12), the term "landfill" means "a disposal facility or part of a facility at which solid waste is placed in or on land and which is not a land treatment facility." Consequently, CROWD argues that a "landfill" is either a landfill facility where no other type of solid waste handling occurs or else a "part of a larger facility which might include a recycling facility, a composting facility, or a waste transfer facility," thus implying that a "landfill" is only the "active" area of the entire facility. Reply Br. of Appellant at 17. We agree with LRI and TPCDH that by using the phrase "part of a facility at which solid waste is placed," the legislature emphasized that there are "parts" of a landfill facility where waste is not placed. Former RCW 70.95.030(12). Thus, by its own terms a *465 "landfill" can be either the "facility" or "part of a facility" where solid waste is placed. If the legislature only intended one designation this would be redundant. Moreover, as LRI and TPCDH correctly point out, the legislature specifically used the phrase "landfill facility" in SSB 5729, not "landfill."
Former RCW 70.95.030 does not define the term "facility"; however WAC 173-351,[4] upon which the trial court relied, defines "facility" as "all contiguous land and structures, other appurtenances, and improvements on the land used for the disposal of solid waste." WAC 173-351-100. Further, WAC 173-351-100 defines "buffer zone" as "that part of a facility which lies between the active area and the property boundary" and "active portion" as "that part of a facility or MSWLF unit that has received or is receiving wastes." (Emphasis added). Thus, the Department of Ecology's regulations clearly contemplate that a "landfill facility" includes not only the active portion of the landfill but also the buffer zone and contiguous lands. Because the legislature passed SSB 5729 specifically to amend the Department of Ecology's regulations pertaining to solid waste handling, it was reasonable for the trial court to interpret the phrase "landfill facility" as including the entire LRI facility in accordance with WAC 173-351-100. Further, the court's interpretation is a sensible construction of the term "landfill facility" because each part of the facility, including the active area, monitoring wells, buffer zone, and wetlands, is necessary to the overall function of solid waste disposal.
Moreover, the legislature expressly specified when it was referring to only the "active area" where the cells are located. It used the phrase "active area" both in the prohibition on location of the "active area" within five miles of a public or private nonprofit zoological park, SSB 5729 § 1(2)(a)(i), Laws of 1999, ch. 116, § 1(2)(a)(i), and in the requirement for a berm "around the entire perimeter of the active area," SSB 5729 § 1(2)(b), Laws of 1999, ch. 116, § 1(2)(b).
Clearly, the legislature distinguished "active areas" from other portions of the "landfill facility." As it did not apply this distinction to the statute's exemption clause, the trial court did not err in construing the term "landfill facility" to include more than the active areas. The legislature specifically stated that SSB 5729 does not apply to "landfill facilities" where construction has commenced prior to passage of the bill. If it had intended that SSB 5729 apply only to those landfills in which construction had begun in the "active" area of the facility, it would have so stated.

B. "Construction"
CROWD next contends that the trial court erroneously used dictionary definitions, rather than legislative history, to define the term "construction" as it is used in SSB 5729. Specifically, CROWD argues that the legislature intended the term "construction" to include only "prospective construction activities on the actual landfill site, and not pre-construction work such as preliminary wetland work and installation of monitoring wells." Br. of Appellant at 39-40. To support this contention, CROWD cites to several extrinsic documents, including letters to and from Pierce County engineers using the phrases "prior to `beginning construction of the dump site'" and "`[p]rior to construction of the landfill.'" Br. of Appellant at 45. CROWD also cites to a transcript of a house floor debate in which the statements, "`construction' had not yet begun at the subject landfill" and "it's back still ready to start construction" were made. Br. of Appellant at 40-41. But as LRI and TPCHD argue, the mere fact that some legislators or engineers may have presumed that LRI had not yet begun construction does not thereby mean that the legislature intended the term "construction" to only encompass LRI's prospective construction activities.
CROWD also appears to argue that because the legislature intended SSB 5729 to "eliminate" the LRI landfill, it must have meant for the term "construction" to only include activities that LRI had not yet begun. Br. of Appellant at 44. CROWD's arguments ignore well-settled rules of statutory *466 construction and merely beg the question.
Here, the trial court properly determined the legislative intent from the language of SSB 5729. The bill is clear on its face; the term "construction" is a common word in the English language and is not ambiguous nor susceptible to multiple interpretations. Because the term "construction" is not defined by either chapter 70.95 RCW or WAC 173-351, the court properly gave the term its usual and ordinary meaning as defined by a standard dictionary. It seems clear that the legislature intended SSB 5729 to apply only to those landfills in which "construction," as it is commonly defined, has not yet begun.
Additionally, Crowd contends that LRI's activities were not "construction" but were merely "pre-construction" activities for the purpose of planning or mitigating the effects of actual construction. Br. of Appellant at 11. This argument is without merit.
At trial, CROWD's expert, Carl Halsan, a real estate developer and consultant, testified that construction of monitoring wells does not constitute "construction" because it is merely part of the "investigative" or "feasibility analysis" stage of planning. I RP at 181. Halsan also testified that landscaping, planting, and installing screening and silt fences do not constitute "construction" because these activities are done merely to mitigate the impacts of construction. 1 RP at 182. However, Comstock testified that under Section VII of LRI's solid waste permit, monitoring wells MW-1 through MW-4 were not installed merely as part of the site characterization work. Rather these wells were a permanent part of the monitoring network for Cell 1. Thus, the trial court was presented with conflicting testimony and found that construction activity had taken place well before April 27, 1999, for the landfill's permanent environmental monitoring system. This alone, regardless of any statutory interpretation of "construction" indicates that construction took place before the act was passed, and this determination is not reviewable. See Pilcher, 112 Wash.App. at 435, 49 P.3d 947.
Because of our determination, we need not fully address the other aspects of work done on the facility, e.g., silt fencing, erosion control, clearing and planting of trees, or even the work done on the day of passage of the act here in question. The wells, which were part of the permanent monitoring system for the active areas, clearly were sufficient to exempt the landfill facility from regulation under the act. Likewise we need not address the cross appeal concerning the average "horizontal height at design capacity" and the validity of the emergency clause provision. Our determination that the wells constituted "construction" obviates any necessity to answer these questions because the wells were installed in November 1998 and the act passed on April 27, 1999.

II. Legality of LRI's Actions
CROWD next contends that even if LRI's actions constituted "construction" of a "landfill facility," those actions were unlawful because LRI had not yet complied with or received all necessary permits to construct MW-1 through MW-4 and the wetlands nursery or to engage in silt fencing and erosion control.
First, CROWD argues that LRI's activities were unlawful under its solid waste permit because the permit requires LRI to submit four copies of the final construction design drawings, construction specifications, and the construction quality assurance manual 60 days prior to commencing construction. However, at trial, Comstock testified that LRI did not need to submit those documents before constructing the groundwater monitoring wells because Section VII of the solid waste permit required and authorized LRI to install the wells. Comstock also testified that his written approval to LRI to relocate MW-1 provided authorization to construct the wells. Moreover, TPCHD concluded that wetlands work, landscaping, and erosion control are outside of its purview and, consequently, that LRI did not violate its solid waste permit, or any other permits, by engaging in these activities. There is sufficient evidence that LRI did not act in violation of its solid waste permit.
Next, CROWD asserts that LRI's wetlands work in early April 1999 was unlawful *467 because its letter of credit to begin wetlands work was not stamped until April 27, 1999. However, the Pierce County Department of Planning and Land Services approved LRI's wetlands mitigation and monitoring plan on April 7, 1999, and Jody Snyder, director of regulatory services for LRI, testified that it was LRI's understanding that the letter of credit was issued prior to the April 7 wetlands approval, even though it was not physically stamped until April 27. Consequently, the record supports the trial court's determination that LRI lawfully engaged in wetlands work.
Additionally, CROWD argues that LRI's activities prior to April 27, 1999, were unlawful because it did not obtain a site development permit until that date. Under Pierce County Code Site Development Permit Ordinance 90-132 § 1.02(B)-(E),[5] a site development permit is not required for the removal or deposit of up to 250 cubic yards of material, clearing and/or grubbing of less than two acres of land, or well drilling activities. Although the record shows that at some point during its site activities, LRI likely brought more than 250 cubic yards of material onto the site before the site development permit issued on April 27, 1999,[6] the record does not show that LRI did so before engaging in any "construction" on the site. Indeed, the evidence suggests that LRI violated these limits when it began mobilizing gravel trucks onto the site for road improvementsnot when it was constructing the monitoring wells or landscaping the facility. Furthermore, a site development permit is not necessary for well drilling activities. In conclusion, the trial court did not err when it found that at least a portion of LRI's site activities prior to April 27 were legal despite that LRI did not yet have a site development permit.
CROWD further contends that the trial court erred in finding that LRI had obtained a site development permit prior to passage of SSB 5729 because it obtained the permit at 3:00 P.M. on April 27, 1999, whereas the bill was not signed into law until 4:15 P.M. CROWD argues that the court's ruling is inconsistent with well-settled law establishing that a legislative act becomes effective for the full day upon which it is signed and not for merely the fraction of the day after it is signed. But this case does not turn on such a fine point. Because LRI engaged in many lawful "construction" activities prior to obtaining a site development permit, it is inconsequential whether SSB 5729 was effective for the entire day or a mere fraction of the day upon which it was signed.
Finally, CROWD argues that the trial court erroneously concluded that LRI did not illegally engage in construction prior to obtaining a Washington State Department of Transportation (WSDOT) permit because the WSDOT events occurred after construction commenced. However, as CROWD itself acknowledges, LRI did not have any problems with WSDOT until it began mobilizing commercial construction trucks off of SR 161. Indeed, WSDOT's cease and desist order stated that LRI had not yet obtained access for the ingress and egress of commercial truck traffic (or WSDOT commercial type "D" vehicles) onto the LRI, Inc. landfill site. No evidence in the record exists to show that LRI violated WSDOT standards or was using heavy, commercial vehicles when it constructed the groundwater monitoring wells, or when it engaged in landscaping, wetland clearing, and erosion control. Thus, the trial court did not err.
Affirmed.
We concur: HOUGHTON, P.J., and ARMSTRONG, J.
NOTES
[1] Chapter 70.95 RCW is Washington's Solid Waste Management Act.
[2] The LRI landfill has eight cells, which constitute the "active" areas of the landfill where solid waste is placed. Ex. 1 at 3.
[3] RCW 70.95.030 was amended in 2004; the definition of "landfill" is now section (13) of the statute. Laws of 2004, ch. 101, § 1. However, former RCW 70.95.030 (2002) applies to this case.
[4] These regulations are the Department of Ecology's criteria for municipal solid waste landfills.
[5] Pierce County determined that this ordinance applied to LRI's landfill.
[6] Primary construction manager for LRI, Lee Fortier, testified that between April 23 and 29, 1999, gravel trucks made approximately 128 trips, ingress and egress, and carried at least 969 tons of rock and gravel onto the site.