[No. 37451-0-II.   Division Two.   September 15, 2009.]

16TH STREET INVESTORS, LLC, ET AL., *Respondents*, v. JOSEPH W. MORRISON, *Appellant*.

46

*James I. Holland* and *James J. Holland* (of *Hall & Holland*) and *Michael B. King* (of *Carney Badley Spellman PS*), for appellant.

*Stephen G. Leatham* (of *Heurlin Potter Jahn Leatham & Holtmann*) and *James T. McDermott* and *Aaron D. Goldstein* (of *Ball Janik LLP*), for respondents.

¶1 BRIDGEWATER, J. — Joseph W. Morrison appeals from a judgment that ordered specific performance of a purchase and sales agreement (PSA), requiring him to sell property he owned in downtown Vancouver, Washington, to an undisclosed buyer (George and Lance Killian through 16th Street Investors LLC). Before sending the PSA to the Killians' representative, Morrison attached a memorandum setting forth an option to purchase a condominium should the buyer develop the property into residential condominiums. Even though the Killians received the PSA, including the memorandum, and accepted it without modification, Morrison initiated further negotiations concerning the option. He attempted to delineate the option terms. The Killians engaged in the negotiations. We hold that the option contained in the PSA was merely an agreement to agree and the PSA was not subject to specific performance. Consequently, we reverse the trial court's judgment regarding specific performance and the other damages the court granted, i.e., an increased tax liability due to the failed transaction and damages to the brokerage house that lost commission on the transaction. As well, the Killians' award of attorney fees is stricken and the matter is remanded for the trial court to award attorney fees to Morrison for the trial and the appeal under the terms of the PSA. We reverse and remand for entry of orders consistent with this opinion.

## FACTS

¶2 Between 1971 and 1987, Morrison acquired seven parcels of property near downtown Vancouver, Washington. Because he supported a revival of downtown Vancouver, he hoped that someday someone would seek to develop his property. He also hoped that he would have an opportunity to live in a residential unit built on the property after someone developed it.

¶3 In the late summer of 2005, Jim Justin informed Morrison that an undisclosed buyer was interested in purchasing his downtown Vancouver property. Justin was a

real estate broker at Coldwell Banker Commercial Jenkins Bernhardt Associates (Bernhardt Associates). One of Justin's colleagues at Bernhardt Associates, Wallace Hornberger, told Justin that he was working with some clients who expressed an interest in Morrison's property. Hornberger was working on behalf of local commercial real estate developers George Killian and his son, Lance Killian.

¶4 The Killians wished to remain anonymous throughout the transaction as a precaution against the seller, Morrison, artificially inflating the property price. According to the Killians, this type of anonymous transaction is typical in the real estate community, particularly one like Vancouver, Washington, where the Killians' real estate projects are sometimes reported in the news. Due to the Killians' desire to remain undisclosed, several real estate agents represented the parties throughout the transaction. Justin represented Morrison. He agreed to protect the Killian's identity and thus did not disclose it to Morrison. Wallace Hornberger acted as a "conduit" between Justin (on behalf of Morrison) and represented the Killians. Bob Berhnardt served as the named buyer in the transaction.

¶5 Morrison did not want to sell the property without retaining an option to purchase a condominium should the buyer develop the property into residential condominiums. He was also concerned that the initial buyer would "flip" the property to another party to develop the property; therefore, he sought to include an option in a recordable agreement. II Report of Proceedings (RP) at 215, 216. Morrison initially had Justin draft an option agreement, but he felt that the language Justin drafted fell short. As a result, Morrison asked his attorney, Greg Call, to prepare a memorandum more formally outlining the option agreement he sought. Call drafted what came to be known as the "Call memorandum," which included the following terms:

(1) The purchase price of $580,000 based on $20 per square foot;

(2) A refundable earnest money deposit of $50,000, to be paid into escrow within three days of acceptance by both parties;

(3) Instruction that the balance of the purchase price be paid in cash, pursuant to a section 1031 exchange;[1] and

(4) Detailed some provisions pertaining to Morrison's option to purchase, including the size and location of the residential unit Morrison would have the option to purchase and a formula for calculating the price of the residential unit Morrison would have the right to purchase.

*See* Ex. 3 (Ex. B); Ex. 4.

¶6 Call gave his memorandum to Justin, who in turn presented it to the Killians for review. The Killians approved the Call memorandum. Thereafter, Morrison wanted to attach the Call memorandum to the PSA; thus, Justin attached the Call memorandum to the PSA document and presented it to Morrison for his signature. Morrison, as seller, initialed and signed the PSA, including the attached Call memorandum, on October 22, 2005.

¶7 On the Killians' direction, Bernhardt, as buyer, signed the PSA, including the attached Call memorandum, on November 9. The Killians accepted Morrison's offer without modifications. Also on November 9, Bernhardt executed a document entitled "ASSIGNMENT AND ASSUMPTION OF AGREEMENT." Ex. 5. The document recited that Bernhardt Associates had entered into the PSA "as an agent for Killian as an undisclosed principal." Ex. 5. It further recited that Bernhardt Associates was now assigning "all liability pursuant to" the PSA to Killian Pacific LLC and or its assigns. Ex. 5.

¶8 Following execution of the PSA, the parties proceeded toward closing. On November 29, 2005, Bernhardt Associates gave Morrison notice that the buyer had satisfied the PSA's "Inspection Contingency," and on December 9, 2005, Bernhardt Associates notified Morrison that the buyer had determined that no "Permitted Exception(s)" would be required regarding title. Ex. 6, 7. In addition, the Killians tendered a $50,000 earnest money promissory note shortly thereafter.

---

[1] A 1031 exchange is a property exchange device authorized by the federal Internal Revenue Code and which can result in substantial tax savings.

¶9 Then, in April 2006, Bernhardt Associates gave notice of an intention to close on May 30, 2006.[2] At some point in May, the Killians formed 16th Street Investors LLC.[3] The sole purpose of 16th Street Investors was to hold the property that the Killians were acquiring from Morrison.

¶10 On May 24, 2006, six days before closing, Chicago Title provided Morrison with copies of the closing documents, including documents making it clear that the buyer was going to participate in a section 1031 exchange as a part of the transaction. On May 25, 2006, at the parties' request, the Killians' attorney provided Morrison, through Chicago Title, a written document acknowledging Morrison's option to acquire a residential unit pursuant to the Call memorandum. The acknowledgement stated in pertinent part:

> **16 STREET INVESTORS, LLC**, having acquired the West 42 feet of Lot 2 in Blocks 3, 4, 5, 6 and 7, BLOCK 71, CITY OF VANCOUVER (commonly known as EAST VANCOUVER) according to the Plat thereof recorded in Volume "C" of Plats, that certain Memorandum attached hereto and by this reference incorporated herein. 16 Street Investors, LLC agrees that if it includes residential units in the construction and development of the aforementioned property, Joseph W. Morrison will be provided the option to acquire a unit as described in the attached Memorandum.[4]

Ex. 20.

¶11 Morrison was not satisfied by the acknowledgement because he felt it did not adequately address his concerns over the option. He refused to close on May 30, as required under the PSA.

¶12 On June 5, Morrison had Call send Justin a proposed form of a revised option agreement along with a cover

---

[2] The closing date was subsequently moved to May 30 because May 29 was a holiday.

[3] Fisher's Terrace LLC is the sole member of 16th Street Investors LLC. Lance Killian, George Killian, and George's wife and Lance's mother, Elaine Killian, are members of Fisher's Terrace LLC.

[4] The "attached memorandum" was the Call memorandum. Ex. 3 (Ex. B); Ex. 4.

memorandum setting forth Morrison's concerns and inviting the Killians' attorney to contact Call directly to discuss those concerns. The Killians initially tried to salvage the transaction by discussing Morrison's option to purchase, but the parties were unable to reach an agreement. On June 16, the Killians' attorney informed Call that the transaction had to close by June 20, as that was the deadline for the buyer's 1031 exchange. On June 20, Morrison terminated all negotiations. Because the 1031 exchange failed to timely close, the Killians suffered a tax liability totaling $100,689.

¶13 On August 8, the Killians, through 16th Street Investors, LLC, and Bernhardt Associates filed a complaint in Clark County Superior Court seeking specific performance, money damages equal to its tax liability, and Bernhardt Associates' commission from Morrison. Following a bench trial, the trial court granted specific performance of the PSA, $100,689 plus interest for the 1031 tax liability, and $17,400 plus interest for Bernhardt Associates' lost commission.

## ANALYSIS

### I. STANDARD OF REVIEW

¶14 Morrison challenges several findings of fact and conclusions of law. In reviewing the trial court's findings and conclusions, we determine whether substantial evidence supports its findings of fact and, in turn, whether the findings support the conclusions of law. *Pilcher v. Dep't of Revenue*, 112 Wn. App. 428, 435, 49 P.3d 947 (2002), *review denied*, 149 Wn.2d 1004 (2003). Substantial evidence is evidence sufficient to convince a fair-minded, rational person of the truth of the finding. *Pilcher*, 112 Wn. App. at 435.

### II. PSA INTERPRETATION

¶15 The crux of Morrison's appeal is that the PSA, including the Call memorandum, did not create a legal

obligation in him to sell the property. Rather, he asserts that it was an agreement to agree. We agree and we hold that the trial court erred by ordering specific performance of the PSA.

## A. PSA LANGUAGE AS A WHOLE

¶16 Morrison places great emphasis on the language in the Call memorandum, contending that it converted the PSA offer into a mere agreement to agree. On October 22, 2005, Morrison signed the PSA, attached the Call memorandum, and transmitted this offer to Bernhardt for his acceptance. The Killians, through Bernhardt, accepted Morrison's offer without any modifications.

¶17 As the trial court noted, the issue is not whether the Call memorandum alone constituted a specifically enforceable contract. Rather, the issue is whether the package as a whole constituted a specifically enforceable contract. We hold that it did not.

¶18 It has long been held that the essential terms of a real estate contract generally include the "subject matter of the agreement, the consideration and terms of payment." *Hubbell v. Ward*, 40 Wn.2d 779, 787, 246 P.2d 468 (1952). When a contract contains all of the material[5] and essential terms of a future contract such that a court can ascertain what the parties must do to constitute performance, then the court may order specific performance. *Hubbell*, 40 Wn.2d at 787.

¶19 Here, the PSA, but for the Call memorandum, included all of the material and essential terms required for

---

[5] The *Hubbell* court separately enumerated 13 specific material factors in a real estate contract (involving structures, not just land):

(a) time and manner for transferring title; (b) procedure for declaring forfeiture; (c) allocation of risk with respect to damage or destruction; (d) insurance provisions; (e) responsibility for: (i) taxes, (ii) repairs, and (iii) water and utilities; (f) restrictions, if any, on: (i) capital improvements, (ii) liens, (iii) removal or replacement of personal property, and (iv) types of use; (g) time and place for monthly payments; and (h) indemnification provisions. *Hubbell*, 40 Wn.2d at 782-83.

*Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993).

a specifically enforceable real estate contract. *Hubbell*, 40 Wn.2d at 787. Morrison objectively represented to the buyers that he would convey his property for consideration of $580,000 plus "additional consideration" of an option to purchase a condominium, or "residential unit" if such were constructed by the buyer. Ex. 3 (Ex. B); Ex. 4. Moreover, the PSA included the following language:

22. MISCELLANEOUS PROVISIONS.

a. **Complete Agreement**. The Agreement and addenda and any exhibits to it state the entire understanding of Buyer and Seller regarding the sale of the Property. There are no verbal or written agreements which modify or affect the Agreement. . . .

b. **No Merger**. The terms of the Agreement shall not merge in the deed or other conveyance instrument transferring the Property to Buyer at closing.

Ex. 3, at 7.

¶20 The attached Call memorandum contained the following paragraph:

As additional consideration, Mr. Morrison would like an option to purchase a condominium if Buyer, at Buyer's election, decides to include residential units in the construction and development of the property. The option would provide for the purchase of one (1) residential unit to be located on an upper level floor and on the south side or on the southwest corner of the building with the square footage of the unit to be the greater of the size of the largest residential unit included in the design or twice the size of the smallest unit planned for the design, but under no circumstances less than 1,600 square feet. The purchase price under the option would be based on Seller's cost per square foot for construction of the selected unit including inside walls, ceilings, windows, plumbing, wiring, ventilation and flooring but not fixtures, appliances, molding, paint, wall paper [sic], cabinets and floor coverings. Buyer and Seller shall agree on a location of electrical outlets, ventilation and plumbing.

Ex. 3 (Ex. B); Ex. 4.

¶21 But despite the above specifics, the issue remains as to the nature of the Call memorandum. *See Hubbell*, 40 Wn.2d at 787.

## B. CALL MEMORANDUM

¶22 Morrison maintains that the "would like" language in the Call memorandum converted the PSA into an agreement to agree. Ex. 4. An agreement to agree is " 'an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete.' " *Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 175, 94 P.3d 945 (2004) (quoting *Sandeman v. Sayres*, 50 Wn.2d 539, 541-42, 314 P.2d 428 (1957)). Agreements to agree are unenforceable in Washington. *Keystone*, 152 Wn.2d at 175.

¶23 The *Keystone* court found that the parties had formed only an agreement to agree and not a binding contract. There, Keystone submitted a letter of intent to purchase a facility that Xerox owned. *Keystone*, 152 Wn.2d at 174. As in the instant case, the letter contained a net purchase price and several other key deal points. *Keystone*, 152 Wn.2d at 174. Xerox then requested a "final and best offer" and Keystone responded by letter, amending the purchase price. *Keystone*, 152 Wn.2d at 175. Xerox replied, stating, " 'Xerox is prepared to negotiate a Purchase and Sale Agreement with Keystone Development subject to two modifications to your Proposal.' " *Keystone*, 152 Wn.2d at 175. Keystone accepted the modifications and on appeal contended that all of the key terms necessary to form a contract were present in its agreements with Xerox. *Keystone*, 152 Wn.2d at 175. The *Keystone* court rejected this contention, finding that Xerox merely manifested an intention to negotiate with Keystone and "an intention to do something 'is evidence of a future contractual intent, *not the present contractual intent essential to an operative offer.*' " *Keystone*, 152 Wn.2d at 179 (quoting *Pac. Cascade Corp. v. Nimmer*, 25 Wn. App. 552, 556, 608 P.2d 266, *review denied*, 93 Wn.2d 1030 (1980)).

¶24 *Keystone* is instructive here. When Morrison attached the Call memorandum to the PSA, he manifested an intention to negotiate his option further with the Killians. *See Keystone*, 152 Wn.2d at 179. Morrison's use of the words "would like" in the Call memorandum created an ambiguity in the contract as a whole and left undefined the nature of the option. Specifically, the Call memorandum stated:

> Mr. Morrison *would like* an option to purchase a condominium if Buyer, at Buyer's election, decides to include residential units in the construction and development of the property.

Ex. 3 (Ex. B); Ex. 4 (emphasis added).

¶25 We hold that Morrison's use of the term "would like" created an undefined material term. Morrison indicated a desire to define an option in the future. Ex. 3 (Ex. B); Ex. 4; *see Keystone*, 152 Wn.2d at 175. It is clear from both Call's and Morrison's testimonies what they desired, at some point, and attempted to clarify the term "residential unit." II RP at 219. It is also clear that Call and Morrison desired that the option would survive a transfer or "flip" by the original buyer. II RP at 215, 216. This was a material term of the option that they attempted to negotiate.

¶26 Indeed, the parties' actions support this conclusion. That the Killians, through their attorney, continued to negotiate with Morrison demonstrates that the option terms captured in the Call memorandum were undefined. The Killians were not unwilling to delineate the full import of the option. Their actions reflect the future nature of the agreement to agree concerning the option.

¶27 Finally, basic contract interpretation compels our holding. The terms of a contract must be sufficiently definite. *Keystone*, 152 Wn.2d at 178. If an offer is so indefinite that a court cannot decide just what it means and fix exactly the legal liability of the parties, its acceptance cannot result in an enforceable agreement. *Sandeman*, 50 Wn.2d at 541. When parties seek specific performance of a contract, rather than damages, a higher standard of proof must be met: " 'clear and unequivocal' evidence that 'leaves

no doubt as to the terms, character, and existence of the contract.'" *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993) (quoting *Powers v. Hastings*, 93 Wn.2d 709, 717, 612 P.2d 371 (1980)).

¶28 Here, the Killians have not offered clear and unequivocal evidence that leaves no doubt as to the terms, character, and existence of the contract. *See Kruse*, 121 Wn.2d at 722. They have not convinced us that the contract and its terms are so definite that we can determine exactly what it means or fix the parties' exact legal liability. *See Sandeman*, 50 Wn.2d at 541. Here, the parties had agreed that they needed to reach a further agreement on the terms of the option. *See Kruse*, 121 Wn.2d at 722. Accordingly, specific performance is not appropriate. *See Kruse*, 121 Wn.2d at 722. And the trial court erred when it found that Morrison breached the PSA when he failed to close by May 30, 2006. We need not address Morrison's argument as to the undisclosed principal's intent, in light of our holding that the plain language establishes an agreement to agree.

¶29 We hold that the trial court's judgment must be reversed regarding specific performance and the other damages the trial court granted, i.e., an increased tax liability due to the failed transaction and damages to the brokerage house that lost commission on the transaction. As well, the Killians' award of attorney fees is stricken and the matter is remanded for the trial court to award attorney fees to Morrison for the trial and the appeal under the terms of the PSA. We reverse and remand for entry of orders consistent with this opinion.

VAN DEREN, C.J., and PENOYAR, J., concur.

Review denied at 168 Wn.2d 1033 (2010).