[No. 51201-3-I.   Division One.   September 2, 2003.]

ESTATE OF EUGENE CHRISTIAN FREITAG, *Appellant*, v. FRONTIER BANK, *Respondent*.

*Stephen J. Sirianni* and *Jonathan P. Meier* (of *Sirianni Youtz Meier & Spoonemore*), for appellant.

*Thomas D. Adams* (of *Thomas D. Adams, P.S.*), for respondent.

Cox, A.C.J. — The rights and duties of parties relating to "payment orders"[1] are governed by Article 4A of the Uniform Commercial Code ("Funds Transfers"), not Article 3 ("Negotiable Instruments"). The primary issue in this case is whether Frontier Bank (Bank) or the estate of its deceased customer, Eugene Freitag (Estate), should bear the loss arising from certain payment orders to the Bank that Estate contends were not authorized. Patricia Olson,

---

[1] A "payment order" is "an instruction of a sender to a receiving bank." RCW 62A.4A-103(1)(a).

the original personal representative of the estate (PR), made the payment orders, and later absconded with the funds that were the subjects of these orders.

We hold that the Bank owed a duty under RCW 62A.4A--202 to execute only authorized payment orders, and that it did not breach this duty by executing the orders of Patricia Olson. Accordingly, we affirm the summary dismissal of the claims of the Estate against the Bank.

Eugene Freitag died on June 5, 1998. On June 15, 1998, his will was admitted to probate and letters testamentary were issued that designated Olson, Freitag's niece, as the personal representative with nonintervention powers under the terms of the Freitag will. On June 29, 1998, Olson presented to the Bank a certified copy of Freitag's death certificate, the letters testamentary issued by the court designating her as the PR, and personal identification proving she was the PR named in the letters testamentary. She directed the Bank to close both a CD account and a checking account in Freitag's name, and to transfer a total of approximately $120,000 in proceeds from these sources into two accounts that she established at the Bank as individual, not fiduciary, accounts. The Bank executed this payment order.

Thereafter, Olson wrote checks on her individual accounts at the Bank to pay what were later determined to be her personal debts from the funds originating from the Estate. She later directed the Bank to wire transfer the remaining funds from her individual accounts, just over $100,000, to her bank in Montana. The Bank executed this second payment order.

John Blackburn was appointed successor PR following discovery of Olson's thefts.[2] He commenced this action against the Bank on behalf of the Estate. Following cross motions for summary judgment the trial court granted the Bank's motion, denying relief to the Estate.

The Estate appeals.

---

[2] The record indicates that Olson stole over $150,000 in estate assets in addition to the amounts originally on deposit at Bank.

■ We may affirm an order granting summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[3] We review questions of law de novo.[4]

Here, the parties expressly agree that there are no genuine issues of material fact. We agree. They further conceded at oral argument that the first of the two payment orders from Olson to the Bank, the direction to close Freitag's two accounts and to transfer the proceeds into Olson's individual accounts, is the transaction on which this case turns. Again, we agree.[5] And both parties conceded, both in their briefing and at oral argument, that this case turns on properly construing and applying Article 4A of the Uniform Commercial Code (U.C.C.) to this transaction.[6] Accordingly, our focus is on the legal questions of whether the Bank owed a duty to the Estate and whether it breached that duty under the agreed facts before us.

## AUTHORIZED PAYMENT ORDER

The Estate argues that the Bank owed it a duty under RCW 62A.4A-202 and breached that duty by executing Olson's first payment order. That order directed transfer of the funds of the Estate into individual rather than fiduciary accounts. We conclude that the Bank did not breach its duty by executing the authorized payment order of Olson, the PR of the Estate with nonintervention powers under Freitag's will.

---

[3] CR 56(c).

[4] *Mains Farm Homeowners Ass'n v. Worthington,* 121 Wn.2d 810, 813, 854 P.2d 1072 (1993).

[5] The legal analysis remains essentially the same regardless of whether it is applied to either or both of the two payment orders that Bank executed.

[6] Article 4A applies to "funds transfers" made by means of one or more *payment orders,* which are instructions of a sender to a receiving bank to pay a fixed amount of money to a beneficiary. RCW 62A.4A-102, -103, -104. Article 3 applies only to negotiable instruments, not to funds transfers through payment orders. "It [Article 3] does not apply to money, *to payment orders governed by Article 4A,* or to securities governed by Article 8." RCW 62A.3-102(a) (emphasis added).

▇▇▇ In order to prevail on this claim, the Estate " 'must establish: (1) the existence of a duty owed [to it]; (2) a breach of that duty; (3) a resulting injury; and (4) that the claimed breach was the proximate cause of the injury.' "[7] Whether a legal duty exists is a question of law.[8] Where the facts are not in dispute, as here, once it is determined that a duty is owed to the Estate, the court then determines whether the facts are within the scope of that defined duty, and whether there was a breach.[9] The Bank owed its customer a duty. The question here is whether the Bank breached its duty to the Estate by executing a payment order that was not authorized. In the absence of a breach of a duty that the Bank owed its customer, there is no claim.

▇ As the parties recognize, the transaction at issue here is a "funds transfer" that is exclusively governed by Article 4A of the Uniform Commercial Code. The official comments to RCW 62A.4A-102, which defines the subject matter of the article, explain that it was drafted to create a comprehensive body of law to define funds transfers and the rights and obligations associated with payment orders.[10] The drafters made a deliberate decision "to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment."[11] The rules embodied in Article 4A are the "exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article."[12]

▇ Olson's directive to the Bank to close Freitag's accounts and transfer the funds to her individual accounts

---

[7] *Miller v. U.S. Bank of Wash., N.A.*, 72 Wn. App. 416, 426, 865 P.2d 536 (1994) (quoting *Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992)).

[8] *Miller*, 72 Wn. App. at 426 (citation omitted).

[9] *Miller*, 72 Wn. App. at 426 (citation omitted).

[10] RCWA 62A.4A-102, Comments.

[11] RCWA 62A.4A-102, Comments.

[12] RCWA 62A.4A-102, Comments.

was a payment order.[13] The ensuing transaction by the Bank in response was a funds transfer.[14] In this case, the Estate, through Olson, as PR, was the "sender," the Bank was the "receiving bank," as well as the "beneficiary's bank," and Olson was the "beneficiary."

The key question is whether the payment order initiated by Olson on behalf of the Estate was authorized under RCW 62A.4A-202(1).[15] This controlling statute states, "A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency."

As the official comment to this section explains,

the question of whether the customer is responsible for the order is determined by the law of agency. *The issue is one of actual or apparent authority of the person who caused the order to be issued in the name of the customer.* . . . If the customer is bound by the order under any of these agency doctrines, subsection (a) treats the order as authorized and thus the customer is deemed the sender of the order.[16]

Simply stated, the question is whether Olson, as PR with nonintervention powers under Freitag's will, had actual or apparent authority to cause the payment order to be issued in the name of the Estate. We conclude that she did.

---

[13] A payment order is the oral, electronic, or written instruction of a sender to a receiving bank to pay or to cause another bank to pay a fixed or determinable amount of money to a beneficiary. RCW 62A.4A-103(1)(a).

[14] A funds transfer is a series of transactions, initiated by a payment order, "made for the purpose of making payment to the beneficiary of the order." "A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order." RCW 62A.4A-104(1).

[15] Because there was no security procedure between Bank and its customer respecting the authenticity of payment orders at the time of Olson's payment order, the governing section is RCW 62A.4A-202(1). *See* RCW 62A.4A-202(2).

[16] RCWA 62A.4A-203, Comment 1 (emphasis added).

■ The existence of actual or apparent authority is dependent on objective manifestations of the principal.[17] "With actual authority, the principal's objective manifestations are made to the agent; with apparent authority, they are made to a third person."[18]

■ " '[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.' "[19] "Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized."[20]

If the payment order is not authorized but is executed by the bank, then the bank "shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount . . . ."[21] The "resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article."[22]

■ The Estate essentially argues that it was not reasonable for the Bank to believe that Olson's payment order was authorized because it directed transfer of Estate funds to individual rather than fiduciary accounts only two weeks after she was appointed PR with nonintervention powers. Specifically, the Estate maintains that the Bank was put on inquiry notice that the order was not authorized because Olson transferred the funds before the conclusion

---

[17] *Smith v. Hansen, Hansen & Johnson, Inc.*, 63 Wn. App. 355, 363, 818 P.2d 1127 (1991), *review denied*, 118 Wn.2d 1023 (1992).

[18] *Hansen*, 63 Wn. App. at 363 n.13.

[19] *Hansen*, 63 Wn. App. at 364 (quoting Restatement (Second) of Agency § 27).

[20] Restatement (Second) of Agency § 8 cmt. c.

[21] RCW 62A.4A-204(1).

[22] RCWA 62A.4A-102, Comments.

of the four-month period for claims of creditors.[23] Also, Olson "commingled" the money with her own by placing it in an individual account.[24] Finally, Estate contends Olson could not possibly have earned over $120,000 in PR fees in two weeks.[25] None of these arguments is persuasive.

In assessing whether the Bank's execution of the payment order was reasonable, we first consider the extent of the Bank's knowledge of Olson's authority to direct transfer of the Estate's funds. What did the Bank know and when did it know it? At the time of the payment order in question, the Bank knew that Olson was the PR under Freitag's will. This was evidenced by the letters testamentary that she presented to the Bank. The record is not clear precisely when the Bank became aware that Olson was a PR with nonintervention powers. But the Estate does not challenge that the Bank had such knowledge at the time of the payment order. In any event, such information was available to the Bank at that time had it asked Olson. Nothing in the record indicates that the Bank knew at the time of the payment order that Olson would later divert the Estate's funds to her own use.

Based on this knowledge, the Estate claims that the Bank was on inquiry notice that something was awry by virtue of Olson's directive to place funds in her individual accounts so soon after qualifying as the PR. But our Supreme Court long ago addressed this question in *In re Snyder's Estate*.[26]

---

[23] *See* RCW 11.40.051(1)(a); *cf. In re Small's Estate*, 27 Wn.2d 677, 681, 179 P.2d 505 (1947) ("The debts of the deceased and the expenses of administration must be paid before distribution of the personal property can be made.").

[24] *See* 1 KELLY A. KUNSCH, WASHINGTON PRACTICE: METHODS OF PRACTICE § 31.25 (1997) ("Usually, it is advisable for the personal representative to open a bank account into which all estate funds will be deposited and out of which the expenses and claims will be paid. Funds of the estate and the personal representative should never be commingled.").

[25] *See* RCW 11.98.070(26).

[26] 122 Wash. 65, 209 P. 1074 (1922).

There, the legatees under a will challenged the final report of the executor under that will.[27] The will provided that the estate should be settled without intervention of any court.[28] The legatees claimed, among other things, that the executor with nonintervention powers commingled estate funds with his own in private bank accounts.[29] They also claimed that he used estate funds for his own benefit.[30]

On appeal from the trial court's dismissal of these claims, the state Supreme Court held that although the placement of fiduciary funds in an individual account is not ideal, "there is no provision of law which requires estate funds to be separately kept, and if the executor ultimately accounts for all of such funds, it cannot be said that he is guilty of misconduct . . . ."[31] Here, Olson was the PR designated in Freitag's will, a will that provided that she should act without the intervention of any court. Like the executor in *Snyder*, Olson placed estate funds in her personal accounts at the Bank. While she later diverted those funds to her own purposes, the focus of our inquiry is at the time she gave the Bank the payment order. While the practice of placing estate funds in a personal account is not a desirable one, it is not illegal. And there is no evidence that the Bank knew or should have known of Olson's intent to divert funds to her own purposes.[32]

The Estate argues, without citation to any relevant authority, that the Bank was on inquiry notice by virtue of Olson's directive to move the funds to her individual accounts. But assuming without deciding that the Bank was on such notice, it is unclear what information relevant to

---

[27] *Snyder*, 122 Wash. at 65-66.

[28] *Snyder*, 122 Wash. at 66.

[29] *Snyder*, 122 Wash. at 66.

[30] *Snyder*, 122 Wash. at 66.

[31] *Snyder*, 122 Wash. at 68.

[32] Although we do not decide the question, it appears that at the time of the payment order there was no loss. *See* RESTATEMENT (SECOND) OF TRUSTS § 179 cmt. d ("If the trustee takes title to the trust property in his individual name in good faith, and no loss results from his so doing, he is not liable for breach of trust.").

Olson's authority to issue the payment order on behalf of the Estate would have been obtained. Again, we have not been directed to any authority that makes the undesirable practice of commingling funds an illegal one.[33] In short, the Bank's decision to honor the payment order as one authorized by the Estate was reasonable.

There is a second reason why we reject the Estate's argument that the Bank's execution of the payment order was not reasonable. The powers of a nonintervention PR are broad. Specifically, RCW 11.68.090(1) states:

> Any personal representative acting under nonintervention powers may borrow money on the general credit of the estate and may mortgage, encumber, lease, sell, exchange, convey, and otherwise have the same powers, and be subject to the same limitations of liability, that a trustee has under RCW 11.98.070 and chapters 11.100 and 11.102 RCW with regard to the assets of the estate, both real and personal, all without an order of court and without notice, approval, or confirmation, and in all other respects administer and settle the estate of the decedent without intervention of court. Except as otherwise specifically provided in this title or by order of court, a personal representative acting under nonintervention powers may exercise the powers granted to a personal representative under chapter 11.76 RCW but is not obligated to comply with the duties imposed on personal representatives by that chapter. *A party to such a transaction and the party's successors in interest are entitled to have it conclusively presumed that the transaction is necessary for the administration of the decedent's estate.*[34]

The Estate's arguments fail to deal persuasively with the plain wording of the statutory presumption that one deal-

---

[33] While we need not decide whether a bank should be put on inquiry notice, there is authority in other jurisdictions that holds that a bank should not be required to inquire beyond the channels of its business to acquire knowledge of a potential breach or fraud. " 'To hold a bank to a higher duty than that of being bound within the channels of its business in acquiring information of any projected breach of trust by an agent who has the power to check upon the funds of the principal in the bank would imperil the banking interests of the country.' " *Grabowski v. Bank of Boston*, 997 F. Supp. 111, 126 (D. Mass. 1997) (quoting 5A MICHIE ON BANKS AND BANKING § 72, at 301 (1994)).

[34] (Emphasis added.)

ing with a PR with nonintervention powers may "conclusively presume[ ] that the [payment order in this case] is necessary for the administration of the decedent's estate." There is nothing in RCW 11.68.090(1) or the statutes cited therein to suggest that a PR with nonintervention powers would not be authorized to place fiduciary funds in an individual account, notwithstanding that such a practice might not be desirable. Recently, another division of this court observed that "the nonintervention estate personal representative, unlike a trustee, has no obligation to identify and segregate assets and expenses while the administration of the estate is ongoing."[35] Accordingly, the Estate fails to establish that the Bank's execution of the payment order was not reasonable given this statutory presumption. The payment order was authorized under RCW 62A.4A-202.

The Estate insists that the presumption in RCW 11-.68.090(1) may be relied on only where a PR is acting within her authorized powers and not here where the Bank *could* ascertain that the PR was in breach of her duties if it only made further inquiries. This position cannot be reconciled with the statute because while the Estate insists that there is a duty of further inquiry, RCW 11.68.090(1) specifically removes this inquiry requirement. The Estate's argument must fail in light of the clear statutory language.

The Estate relies heavily on *Smith v. Olympic Bank*[36] to establish this duty of inquiry. That case is factually and legally distinguishable.

First, that was a check case decided under U.C.C. Article 3, not U.C.C. Article 4A. As we previously noted, Article 4A controls this transaction, not Article 3.

In *Smith*, a father was appointed guardian for his minor son, who was the beneficiary on his grandfather's life insurance policy. The insurance company issued a check

---

[35] *In re Estate of Jones*, 116 Wn. App. 353, 367-68, 67 P.3d 1113 (2003) (citing *Snyder*, 122 Wash. 65).

[36] 103 Wn.2d 418, 693 P.2d 92 (1985).

payable to the father, as guardian of the estate of the son.[37] Despite the clear language on the check that it was payable to the father only as guardian for his son, the bank allowed the father to open a nonguardianship account in his own name.[38] The father and his new wife then spent all the guardianship money. The court identified the issue as whether the bank had knowledge that the guardian was breaching his fiduciary duty.[39] The court concluded that it did have knowledge, and that the bank took the check with notice of an adverse claim, was not a holder in due course under former RCW 62A.3-302 (1965), and was liable to the petitioner.[40]

The Estate's argument that the court in *Smith* did not strictly apply U.C.C. Article 3 and thus the reasoning should be applicable here by analogy is not convincing. The Estate concludes that *Smith* stands for the general proposition that fiduciary funds should never be placed in a nonfiduciary account. This is not the holding of *Smith*. Moreover, it directly contradicts the holding in *Snyder* that although commingling funds is an undesirable practice it is not an illegal one. The Estate also concludes that under *Smith*, the Bank's duty to inquire does not depend on actual knowledge that Olson intended to defraud the Estate. The Estate argues that the duty attaches if the Bank should have known that something was awry. This argument fails in light of RCW 11.68.090(1), which indicates that the Bank could conclusively presume that the transaction was for the administration of the estate because of Olson's nonintervention PR powers.

The Estate also cites to *Richards v. Seattle Metropolitan Credit Union*[41] to support its inquiry notice argument. *Richards* is a check case and is inapposite. It was decided

---

[37] *Smith*, 103 Wn.2d at 420.

[38] *Smith*, 103 Wn.2d at 420.

[39] *Smith*, 103 Wn.2d at 422.

[40] *Smith*, 103 Wn.2d at 422.

[41] 117 Wn. App. 30, 68 P.3d 1109 (2003).

under Article 3, not Article 4A of the U.C.C., and neither *Snyder* nor the presumption under RCW 11.68.090(1) applicable in this case was at issue there.

In *Richards*, a father acting in a fiduciary capacity for the benefit of his daughter placed fiduciary funds in his personal account, receiving $100 cash back at the time he deposited the check.[42] He later established a Uniform Transfer to Minors Act (UTMA) account at another bank and then misappropriated the funds from that account.[43] This court concluded that the credit union was liable only for the $100 the father withdrew when he deposited the check into his personal account because the later act of establishing a UTMA account, which is functionally equivalent to a guardianship account, broke the chain of causation from the credit union's wrongful act and the later misappropriation of the funds.[44] *Richards* does not help the Estate overcome the presumption in RCW 11.68.090(1), nor does it stand for the proposition, advocated by the Estate, that the Bank had an additional duty of inquiry.

Finally, the Estate argues that the Bank violated its own internal operating procedures. But this argument fails to address the question of whether the payment order was authorized—the dispositive question under Article 4A. Furthermore, this appears to be an attempt by the Estate to impose additional duties on the Bank beyond those duties articulated in Article 4A. As the article states, it is the "exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article."[45] We conclude that the Estate's argument is neither legally nor factually persuasive.

To summarize, Olson's payment order was authorized. The Bank did not breach its duty under RCW 62A.4A-202,

---

[42] *Richards*, 117 Wn. App. at 33.

[43] *Richards*, 117 Wn. App. at 33.

[44] *Richards*, 117 Wn. App. at 40.

[45] RCWA 62A.4A-102, Comments.

and there was no duty of further inquiry under either RCW 62A.4A-202 or chapter 11.68 RCW. The Estate, not the Bank, must bear the loss.

We affirm the summary judgment order.

AGID and SCHINDLER, JJ., concur.