170 P.3d 37 (2007)
139 Wash.App. 854
John A. HOGLUND, individually and as owner and agent of John A. Hoglund, P.S., Respondent,
v.
Steven MEEKS, Jay Goldstein and Sherrelle Willingham; Goldstein Law Office, Appellants.
No. 34992-2-II.
Court of Appeals of Washington, Division 2.
July 24, 2007.
*40 Steven Meeks, Olympia, WA, pro se.
John Michael Morgan, J. Michael Morgan PLLC, Olympia, WA, for Appellants.
Michael Wayne Johns, Davis Roberts & Johns PLLC, Gig Harbor, WA, for Respondent.

PUBLISHED IN PART OPINION
HUNT, J.
¶ 1 This case involves breach of a fee-sharing contract among attorneys who at various times served as a plaintiff's attorney in a personal injury lawsuit otherwise unrelated to this appeal. Defendants Steven Meeks, Jay Goldstein, and Sherelle Willingham appeal the trial court's liquidated damages award and bench trial finding that they breached their contract with Plaintiff John Hoglund in failing to share the contingent attorney fee when their mutual client settled, with the insurance company. Defendants argue that (1) Willingham did not have apparent authority to contract on behalf of their law firm, the Goldstein Law Office, where she worked as an attorney; (2) there was no agreement between Hoglund and Willingham forming the basis of a contract to share the contingent attorney fee for the personal injury client; (3) the trial court abused its discretion in admitting evidence of the personal injury client's settlement; (4) the trial court erred in awarding prejudgment interest; and (5) Willingham did not receive proper service. In addition, Defendant Meeks individually argues that even if there was a valid contract between Willingham and Hoglund, there was not substantial evidence of a contract between him (Meeks) and Hoglund.
¶ 2 Holding that Willingham had apparent authority to enter into a fee-sharing contract with Hoglund, we affirm.

*41 FACTS

I. LEGAL REPRESENTATION

A. Original Contract Between Willingham (at Graf Firm) and Hoglund
¶ 3 Following an automobile accident in June 2000, in which he was injured, Robert Bostwick entered into a contingent fee agreement with Olympia attorney F. Daniel Graf. Graf agreed to represent Bostwick in his personal injury case with the understanding that Graf could associate outside counsel to assist in Bostwick's representation. Their fee agreement provided for a one-third contingent attorney fee on any recovery from the litigation. Paragraph 10 of the fee agreement stated that an attorney withdrawing from Bostwick's representation would receive no fee.
¶ 4 Sherelle Willingham, an associate attorney at Graf's law firm, was the primary contact and lead attorney for Bostwick. In June 2001, Graf entered into an association of counsel agreement with attorney John Hoglund. Under the agreement, Hoglund was the lead attorney; he undertook the primary representation of Bostwick and, in return, he was entitled to 80 percent of the contingent fee if he recovered damages for Bostwick. Once Hoglund obtained Bostwick's file, Willingham's involvement was "limited to periodic, regular conferences" with Hoglund's paralegal. Hoglund and Willingham had very limited contact concerning the Bostwick litigation.
¶ 5 Between June 2001 and July 2003, Hoglund provided most of the legal assistance on Bostwick's case. Hoglund filed the complaint, engaged in discovery, and retained expert witnesses. He also attended a mediation with Bostwick and the tortfeasor's insurance company and procured and rejected a $150,000 settlement offer as too low, telling Bostwick that the offer would increase once the insurance company had an opportunity to evaluate the claim fully.

B. Willingham Leaves Graf Firm for Goldstein Firm
¶ 6 While Hoglund was working on Bostwick's case, in July 2001, Willingham left the Graf law firm to work part-time at the Goldstein Law Office. Graf allowed Willingham to take her personal injury cases to Goldstein, one of which was Bostwick's case.
¶ 7 At the Goldstein firm, Willingham handled several cases that had originated with the Graf firm and contained a fee arrangement with Hoglund similar to their fee agreement in the Bostwick litigation. When Hoglund settled or resolved a case that had originated at the Graf law firm, he would send a portion of the attorney's fee to Willingham at the Goldstein Law Office. Willingham would then, in turn, forward a portion of this check to Graf. This relationship continued for two years with no problems. Hoglund and Willingham split fees on cases without a written agreement.

C. Hoglund Downsizes Practice; Negotiations for Bostwick's Future Representation
¶ 8 In September 2003, Hoglund downsized his practice, associated with another law firm,[1] and explained to Bostwick that he wanted to bring in another lawyer from his new firm to assist with the litigation. Bostwick refused and asked Hoglund to bring Willingham back into the litigation and to transfer his file to her.

1. Hoglund and Willingham discuss roles
¶ 9 Graf was disbarred. For this reason, on September 26, Willingham sent a letter from the Goldstein Law Offices to Bostwick explaining that they needed to terminate their legal services agreement with Graf and to enter into a new agreement with the Goldstein firm and a new association of counsel agreement with Hoglund. Hoglund received a copy of this letter.
¶ 10 On September 29, Hoglund told Willingham that he no longer wished to be the lead trial attorney for the Bostwick litigation, *42 but he would continue to handle strategy issues and to assist in managing the file. Willingham told Hoglund she wanted him to remain on the case and that she had reservations about taking over as the lead trial attorney herself.
¶ 11 Hoglund and Willingham discussed the future fee arrangement for the Bostwick litigation. Hoglund suggested that he receive: 80 percent of the contingent fee on the first $150,000 of recovery, because he had already negotiated a settlement offer in that amount for Bostwick; 50 percent of any additional contingent fee if the case settled at a future mediation; and 10 percent of any additional contingent fee if the case went to trial. Not reaching a definitive agreement on the exact breakdown of the fee split, they decided to revisit the issue. Hoglund knew, however, that Willingham needed the Goldstein firm's assent before any agreement on future fees became final.
¶ 12 Hoglund continued to work on the Bostwick litigation. He revised and finalized interrogatory answers, met with the case's expert physician, and advanced the associated expenses.
¶ 13 By early October, Willingham confirmed that she had filed a co-counsel association document in the Bostwick litigation. She told Hoglund that she was finalizing a draft association agreement with the Goldstein firm for him to sign. Hoglund turned over all of his work product to Willingham, including his correspondence and notes, interrogatory answers, analysis of previous medical care, analysis of medical diagnoses, evaluation of the case's weaknesses and strengths, trial preparation, and a "complete mediation preparation and presentation materials." Clerk's Papers (CP) at 1116-17. The record does not show whether Willingham ever finalized the Goldstein association agreement for Hoglund to sign.

2. Willingham's association with Meeks
¶ 14 Uncomfortable acting as Bostwick's lead trial attorney, Willingham contacted Steven Meeks, who leased office space from the Goldstein firm. Meeks agreed to substitute for Hoglund as lead counsel in the Bostwick litigation. Bostwick agreed to Meeks' serving as the lead trial attorney. Meeks never entered into a written fee agreement with Goldstein, Willingham, or Bostwick.

3. Discussions among Hoglund, Willingham, and Meeks
¶ 15 Hoglund, Willingham, and Meeks arranged to meet to discuss the Bostwick litigation on December 2 and 17. The parties did not reach an agreement on Hoglund's future role in the litigation or Hoglund's final compensation.
¶ 16 Hoglund still believed he was assisting with Bostwick's case by working on the medical issues, trial strategy, and preparing for the second mediation. He was willing to attend depositions, but he did not want to be involved in the actual trial. At this point, neither Meeks nor Willingham had performed any significant work on the case, and neither expressly told Hoglund that they no longer wished for him to be involved in the case. Although Meeks was convinced that Hoglund would no longer be useful if he was unwilling to appear in court at trial, Meeks did not tell Hoglund that Meeks saw no role for Hoglund in the Bostwick litigation or that Meeks did not believe Hoglund was entitled to any portion of the contingent fee.
¶ 17 January 2004 passed with no contact among the attorneys. On February 4, 2004, Willingham informed Hoglund that it was too early to discuss his final fee but that she was still working on the agreement. Later in the month, Willingham informed Hoglund that Meeks agreed with Hoglund's assessment of the case and that Willingham and Meeks would attempt another mediation.
¶ 18 At the end of February, Hoglund received a phone call from Defendant attorneys informing him that they wished to organize another mediation for the Bostwick litigation. Hoglund referred the call to Willingham. In March, Willingham sent Hoglund an order substituting Meeks as counsel of record for Bostwick. No explanation accompanied the substitution of counsel order. Hoglund, however, assumed that the substitution order was necessary for Meeks and Willingham to take over his (Hoglund's) role as the primary lead attorney in the mediation *43 while Hoglund's role diminished, but did not disappear.

4. Settlement
¶ 19 Willingham and Meeks prepared for the second Bostwick mediation by producing a detailed medical history to refute any defense claims of a pre-existing injury and lack of causation. Neither Meeks nor Willingham supplemented Hoglund's previous submissions with any additional documentation or argument.
¶ 20 Willingham and Meeks presented Bostwick's case at the mediation. Bostwick's defendant offered to settle for $840,000. Meeks and Willingham agreed to reduce the contingent attorney fee to 23 percent if Bostwick accepted the settlement offer, which he did. Meeks and Willingham received $190,000 in attorney fees, which they did not share with Hoglund.
¶ 21 Willingham updated Hoglund on Bostwick's acceptance of the settlement. She told Hoglund that (1) he would receive "80 percent of the first 50,000, reduced by a pro rata share of what we had reduced the fee," Report of Proceedings (RP) at 107; and (2) she would have to check with Goldstein and Meeks to confirm the final sum. Meeks, however, did not believe that Hoglund was legally entitled to any portion of the attorney fees. Consequently, Meeks and Goldstein reimbursed Hoglund only for his out-of-pocket expenses in the Bostwick litigation, approximately $6,000.

II. PROCEDURE
¶ 22 Hoglund sued Meeks, Willingham, and Goldstein to recover attorney fees in the Bostwick litigation. He sought damages under three alternative theories: breach of contract, quantum meruit, and unjust enrichment. Willingham claimed that she had not received proper service of Hoglund's complaint and summons.
¶ 23 During a one-day bench trial, the parties testified consistently with the above facts. Goldstein and Willingham testified that Willingham did not have actual authority from the Goldstein firm to contract with Hoglund about attorney fee apportionment in the Bostwick litigation.
¶ 24 The trial court found that (1) Hoglund was the most credible witness; (2) it "had difficulty" with Meeks' credibility; (3) there was a contract between Hoglund and Willingham/Meeks to apportion attorney fees; and (4) Wilhngham had apparent authority to contract for Goldstein.[2]
¶ 25 As for the attorney fee contracts, the trial court reasoned that (1) the parties had firmly settled on Hoglund's entitlement to 80 percent of the $50,000 contingent fee from the original $150,000 settlement offer;[3] (2) but the parties did not agree to the exact terms for any additional amounts; and (3) thus, Hoglund could not recover in contract on any amount over $40,000.
¶ 26 Hoglund presented the trial court with a declaration from the process server to show sufficient service of the complaint. Supported by a declaration from her secretary, *44 Willingham testified that she had not received timely service. The trial court believed the process server.
¶ 27 The trial court awarded Hoglund $40,000 for breach of contract, with prejudgment interest beginning on April 15, 2004.
¶ 28 Defendants appeal.

ANALYSIS

I. WILLINGHAM'S AUTHORITY TO CONTRACT
¶ 29 Defendants challenge the trial court's finding that Willingham had apparent authority to contract for the Goldstein firm when she entered into fee-sharing agreements with Hoglund. This challenge fails.

A. Apparent Authority
¶ 30 An agent can bind its principal to a contract when the agent has either actual or apparent authority.[4] The existence of apparent authority is a question of fact for the trial court. Smith v. Hansen, 63 Wash. App. 355, 363, 818 P.2d 1127 (1991), review denied, 118 Wash.2d 1023, 827 P.2d 1392 (1992). On appeal, we examine whether substantial evidence supports the trial court's finding of apparent authority. Rainier Nat'l Bank v. Clausing, 34 Wash.App. 441, 444, 661 P.2d 1015 (1983).
¶ 31 A trial court may find apparent authority based only on the principal's actions toward a third party and not based solely on the agent's actions. Nonetheless, actual authority to perform certain services on a principal's behalf results in implied authority to perform the usual and necessary acts associated with the authorized services. Larson v. Bear, 38 Wash.2d 485, 490, 230 P.2d 610 (1951). In addition, a party dealing in good faith with an agent who appears to be acting within the scope of the agent's authority is not bound by undisclosed limitations on the agent's power. Feely Lumber Co. v. Bookstaver-Burns Lumber Co., 181 Wash. 503, 510, 43 P.2d 953 (1935). As our Washington Supreme Court has articulated:
[T]he principal is bound by the act of his agent when he has placed the agent in such position that persons of ordinary prudence, reasonably conversant with business usages and customs, are thereby led to believe and assume that the agent is possessed of certain authority and to deal with him in reliance upon such assumption.
Mohr v. Sun Life Assur. Co., 198 Wash. 602, 603-04, 89 P.2d 504 (1939).

B. Willingham's Apparent Authority to Contract on Behalf of Goldstein Firm
¶ 32 The relationship among Hoglund, Goldstein, and Willingham corresponds to cases where an agent's authority to perform particular services on behalf of a principal creates the implied authority to perform the usual and necessary acts essential to carry out the authorized services. See Walker v. Pacific Mobile Homes, Inc., 68 Wash.2d 347, 351, 413 P.2d 3 (1966).[5] In Walker, our Washington Supreme Court addressed a mobile home salesman's apparent authority to take consignment of the plaintiff's trailer on behalf of his employer, the mobile home dealer, even though it was clear that the salesman had no actual authority. In finding apparent authority, the Court relied on the salesman's general appearance of authority: The dealer had placed the salesman on a mobile home sales lot displaying the dealer's name, in circumstances such that there was no reason for a prudent person to question whether the salesman lacked full authority to deal in mobile homes, including the power to accept consignments on the dealer's behalf. 68 Wash.2d at 350-51, 413 P.2d 3.
*45 ¶ 33 Similarly here, Goldstein placed Willingham in a position in which a reasonable person would believe she had the authority to represent clients on behalf the Goldstein firm, including having authority to enter into an attorney-fee-sharing contract with lawyers outside the firm. Furthermore, Goldstein specifically allowed Willingham to have exclusive control over the Bostwick litigation. He allowed her (1) to negotiate with Bostwick to retain the Goldstein law firm; (2) to file a co-counsel agreement associating Hoglund in the Bostwick litigation in the Cowlitz County Superior Court; (3) to contact Meeks to obtain his services; (4) to instruct Bostwick to reimburse Hoglund $6,000 in expenses; (5) to obtain over $100,000 in fees in the Bostwick litigation; and (6) to reduce the contingent fee agreement in order to persuade Bostwick to accept the insurance company's settlement offer at the second mediation.
¶ 34 In addition, an agent's unlimited use and access to her principal's stationery, business forms, and control of the office justifies the third party's reasonable belief in the agent's authority. Compare Walker, 68 Wash.2d at 351, 413 P.2d 3 with Smith, 63 Wash.App. at 357-58, 818 P.2d 1127, (no finding of apparent authority when communication with agent neither occurred at principal's office nor on principal's letterhead). Here, Willingham communicated with Bostwick and Hoglund using Goldstein Law Firm stationery; her superior court pleadings showed the Goldstein name, address and phone number; and she held Bostwick litigation meetings at the Goldstein Law Offices, all with Goldstein's tacit approval. Thus, under Walker, Willingham's use of the Goldstein firm stationery, pleading paper, and facilities further underscored her apparent authority to act on the firm's behalf.[6]
¶ 35 Goldstein contends that these facts could not create such apparent authority in Willingham because he never communicated with Hoglund himself about anything, particularly not with respect to Willingham's authority to act on behalf of his firm. This challenge fails.
¶ 36 Case law does not so narrowly confine conduct creating apparent authority to express written or verbal communication. See Estate of Freitag v. Frontier Bank, 118 Wash.App. 222, 229, 75 P.3d 596 (2003) (principal creates apparent authority by "written or spoken words or any other conduct of the principal") (emphasis added); Emrich v. Connell, 41 Wash.App. 612, 621-22, 705 P.2d 288 (1985) (apparent authority may stem from agent's actions taken with the principal's knowledge), reversed on other grounds by Emich, 105 Wash.2d 551, 716 P.2d 863 (1986); RESTATEMENT (SECOND) OF AGENCY § 27 (2005). That Goldstein had no direct written or verbal contact with Hoglund does not undermine the trial court's finding of Willingham's apparent authority. On the contrary, it was Goldstein's knowledge and approval, whether tacit or express, of Willingham's ability to control all aspects of the Bostwick litigation that gave rise to Hoglund's reasonable belief that Willingham had authority to negotiate his fee for his work on the Bostwick case.
¶ 37 From the perspective of a reasonably prudent person, such as Hoglund, we see no qualitative difference between Willingham's apparent authority to manage and to control the Bostwick litigation and her ability to negotiate a fee-splitting agreement in connection with this litigation. We, therefore, affirm the trial court's ruling that Hoglund reasonably believed that Willingham had authority to contract on behalf of the Goldstein *46 firm, including authority to enter into an attorney-fee-splitting agreement with him.[7]

II. CONTRACT FORMATION
¶ 38 Having held that Willingham had the Goldstein firm's apparent authority to enter in to a fee agreement with Hoglund, we next address whether she and Hoglund actually formed an enforceable contract under which Hoglund was to receive a share of the Bostwick litigation attorney fees. Again agreeing with the trial court, we hold that they did enter into such a contract.

A. Standard of Review
¶ 39 Washington follows the objective manifestation test for contracts. Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wash.2d 692, 699, 952 P.2d 590 (1998). Accordingly, to form a contract, the parties must objectively manifest their mutual assent. Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wash.2d 371, 388, 858 P.2d 245 (1993). Moreover, parties must assent to sufficiently definite terms. Keystone Land & Dev. v. Xerox Corp., 152 Wash.2d 171, 178, 94 P.3d 945 (2004).
¶ 40 A contract may be oral as well as written, and a contract may be "implied in fact with its existence depending on some act or conduct of the party sought to be charged." Bell v. Hegewald, 95 Wash.2d 686, 690, 628 P.2d 1305 (1981). A trial court may deduce mutual assent from the circumstances, whereby the court infers a contract based on a course of dealings between the parties or a common understanding within a particular commercial setting. Bell, 95 Wash.2d at 691, 628 P.2d 1305.
¶ 41 Whether parties manifested mutual assent to form a contract is generally a factual question. Keystone, 152 Wash.2d at 178 n. 10, 94 P.3d 945. Thus, we review the trial court's finding for substantial evidence. Pilcher v. Dep't of Revenue, 112 Wash.App. 428, 435, 49 P.3d 947 (2002), review denied, 149 Wash.2d 1004, 67 P.3d 1096 (2003). Substantial evidence is evidence sufficient to convince a fair-minded, rational person of the truth of the finding. Pilcher, 112 Wash.App. at 435, 49 P.3d 947. Further, we review the evidence in the light most favorable to Hoglund, the prevailing party. Id.

B. Hoglund's Contract with Willingham
¶ 42 The trial court found that at the September 2003 meeting, Hoglund and Willingham orally modified the original Graf fee contract, agreeing that Hoglund would step down as lead counsel, remain on the case in a limited capacity, turn over his litigation materials to Willingham, and be entitled to receive $40,000 from a recovery in the Bostwick litigation because this figure was 80 per cent of the contingent fee on the original settlement offer that Hoglund negotiated on Bostwick's behalf. More specifically, the trial court found Hoglund credible when he testified that at their initial September 2003 meeting, Willingham expressly agreed to Hoglund's right to 80 per cent of the contingent fee from the first $150,000 of any settlement. Willingham challenges this finding of fact, arguing that there could have been no meeting of the minds when Hoglund's exact fee and the scope of his future involvement in the litigation was uncertain. We disagree.
¶ 43 Although some contract terms lacked specificity, substantial evidence supports the trial court's ruling. The evidence at trial showed that Hoglund offered to step down as lead counsel in the Bostwick litigation, turn over all of his work product, and maintain a limited role in exchange for a fixed attorney fee on the first $150,000 recovered and an additional fee based on whether the case settled or went to trial. Willingham accepted this offer when she accepted all of Hoglund's work product, kept him involved in the case, and repeatedly promised to work out the specific terms of a written memorialization *47 of their agreement. See Goodman v. Darden, Doman & Stafford Assoc., 100 Wash.2d 476, 483, 670 P.2d 648 (1983); RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981) (implied acceptance when offeree takes benefit of offered services with an opportunity to reject them and chooses not to).
¶ 44 In addition, Hoglund and Willingham discussed the fee agreement against a backdrop of having worked together on this case for seven years, and on many other cases, similarly splitting attorney fees along these same lines. Furthermore, after settling the Bostwick litigation, Willingham immediately contacted Hoglund to inform him that he would receive his $40,000.[8] Taken together, this conduct supports the trial court's finding that Willingham articulated an agreement with Hoglund to pay him this base fee and that she intended to be bound by her agreement.
¶ 45 Nevertheless, the trial court specifically found the contract terms too indefinite to form the basis of a contract to pay Hoglund future fees for more than this base $40,000. For that reason, the trial court concluded that Willingham and Hoglund had a contract for only the base fee of 80% on the first $150,000 of the contingent fee, namely $40,000. The record supports the trial court's findings of fact, which in turn support its conclusions of law.

C. Hoglund's Contract with Meeks
¶ 46 Meeks argues that the trial court made no specific findings that he agreed to contract with Hoglund and, thus, the record does not substantiate the trial court's conclusion that Defendants are jointly and severally liable. Meeks is correct that the trial court did not find an express agreement between him and Hoglund. Unlike Willingham, Meeks neither negotiated a fee agreement with Hoglund nor had an extensive history of legal cooperation and split fees with him. This fact, however, is not determinative of the issue before us.
¶ 47 The trial court found that Meeks was fully aware of Willingham's agreement with Hoglund, that Meeks accepted the benefits of this agreement, and that he remained silent without objecting to Hoglund's belief that he was entitled to a portion of the Bostwick litigation recovery. The record supports the trial court's finding: Meeks knew that Hoglund had brought this case back to Willingham with the understanding that he would relinquish his role as lead counsel in exchange for a reduced attorney fee on any future recovery. Meeks was well aware that Hoglund had invested years in the case, during which Hoglund had taken depositions, answered interrogatories, retained experts, developed trial strategy, and compiled a mediation packet. With this background knowledge, Meeks took over Hoglund's work product and, only two months later, settled Bostwick's case for $840,000, including $190,000 for attorney fees. As the trial court correctly found, if Meeks did not wish to contract and to share attorney fees with Hoglund, Meeks could not passively take over Hoglund's multi-year work product and reasonably expect to keep for himself all the attorney fee benefits without paying Hoglund his share. See RESTATEMENT (SECOND) OF CONTRACTS § 69.
¶ 48 Again, whether Meeks demonstrated acceptance of Willingham's fee-sharing contract with Hoglund through his silence is a factual question for the trial court, which was in a better position to examine credibility and to weigh evidence. In performing this function, the trial court found Hoglund credible and Meeks not credible. The trial court further found that Hoglund offered his work product through Willingham to Meeks and that Meeks used Hoglund's work product, knowing that Hoglund expected compensation. We hold, therefore, that the trial court had substantial evidence to find that Meeks ratified the fee-sharing contract through his silence.

III. MEEKS' PUBLIC POLICY ARGUMENT
¶ 49 Meeks separately argues that it is a violation of public policy for Hoglund to retain *48 an interest in the Bostwick contingent fee because he withdrew from the litigation. We disagree. Neither the facts nor public policy support Meeks' position.
¶ 50 Meeks relies on Mazon v. Krafchick, 158 Wash.2d 440, 144 P.3d 1168 (2006), and RPC 1.5(e) as authority for his position. Mazon is not on point, Mazon involves an attorney suing his co-counsel for loss of prospective fees after co-counsel failed to serve a complaint on time, causing the statute of limitations to lapse and the resultant inability to file the lawsuit. 158 Wash.2d at 443, 144 P.3d 1168. The Mazon holding is limited to prospective fees. Id. at 446, 144 P.3d 1168. Here, in contrast, Hoglund seeks to collect actual fees based on contract for work he performed in the past, which work contributed to Bostwick's favorable settlement.
¶ 51 Moreover, RPC 1.5(e) specifically allows division of attorney fees in proportion to the "services provided" or "by written agreement with the client." Here, Hoglund seeks a division of attorney fees based on proportion of his "services provided." The RPC specifically allows this type of attorney fee split; therefore, it is not contrary to public policy.[9]

IV. EVIDENCE OF SETTLEMENT
¶ 52 Defendants contend that the trial court erred in admitting testimony about the two mediations in the Bostwick litigation, contrary to RCW 5.60.070(1). We disagree.

A. Standard of Review
¶ 53 Admission of evidence is within the trial court's sound discretion. We will not reverse absent a showing of abuse of trial court discretion, even if we might have excluded the proffered evidence had we been in the trial court's position. See State v. Stubsjoen, 48 Wash.App. 139, 147, 738 P.2d 306, review denied, 108 Wash.2d 1033 (1987).
¶ 54 Abuse occurs when the trial court's discretion is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971). We hold that Defendants have not met this high standard here.

B. RCW 5.60.070(1)
RCW 5.60.070(1) provides:
If there is a court order to mediate, a written agreement between the parties to mediate, or if mediation is mandated under RCW 7.70.100, then any communication made or materials submitted in, or in connection with, the mediation proceeding, whether made or submitted to or by the mediator, a mediation organization, a party, or any person present, are privileged and confidential and are not subject to disclosure in any judicial or administrative proceeding except:
(a) When all parties to the mediation agree, in writing, to disclosure;
(b) When the written materials or tangible evidence are otherwise subject to discovery, and were not prepared specifically for use in and actually used in the mediation proceeding;
(c) When a written agreement to mediate permits disclosure;
(d) When disclosure is mandated by statute;
(e) When the written materials consist of a written settlement agreement or other agreement signed by the parties resulting from a mediation proceeding;
(f) When those communications or written materials pertain solely to administrative matters incidental to the mediation proceeding, including the agreement to mediate; or
(g) In a subsequent action between the mediator and a party to the mediation arising out of the mediation.
*49 ¶ 55 Defendants are correct that a contract dispute among attorneys is not one of the enumerated exceptions to nondisclosure under RCW 5.60.070. Nor is there any Washington case law discussing these exceptions. Thus, we address an issue of first impression.
¶ 56 The similar language of ER 408, which addresses the admissibility of compromise and offers to compromise, informs our decision. ER 408 bars admission of settlements and settlement offers "to prove liability for or the invalidity of the claim or its amount." Nonetheless, the rule allows evidence of settlements and settlement negotiations for purposes other than to prove liability. See, e.g., Bros. v. Pub. School Employees of Wash., 88 Wash.App. 398, 408-09, 945 P.2d 208 (1997) (trial court properly admitted settlement negotiations to show that the defendant did not repudiate the contract). This admissible purpose of such evidence under ER 408 echoes a similarly admissible purpose under RCW 5.60.070(1)'s sixth exception, which allows evidence of a mediation:
(f) When those communications or written materials pertain solely to administrative matters incidental to the mediation proceeding, including the agreement to mediate. . . .
¶ 57 Hoglund introduced evidence of the Bostwick mediation solely to demonstrate his damages from unpaid attorney fees; this purpose had no bearing on the issue of liability in the underlying litigation between Bostwick and his tortfeasor. Thus, evidence of the Bostwick mediation is admissible under ER 408 to prove the existence of attorney-fee-sharing agreements, which have no bearing on the inadmissible purpose of proving Bostwick's tortfeasor's liability in the underlying negligence action.
¶ 58 We hold, therefore, consistent with ER 408, that RCW 5.60.070 does not prohibit evidence of the Bostwick mediation to prove Hoglund's entitlement to a share of the attorney fees in the Bostwick litigation, a purpose separate from the statutorily prohibited purpose of establishing liability in that underlying action.
¶ 59 Furthermore, a common sense reading of the statute extends the mediation confidentiality privilege to Bostwick and his tortfeasor's insurance company to prevent introducing evidence of their mediation if their case had gone to trial. This statutory confidentiality privilege does not, however, extend to their attorneys, namely the litigants here  Hoglund, Meeks, Willingham, and Goldstein. Because neither Bostwick nor his tortfeasor's insurance company is a party to the instant attorney-fee-sharing lawsuit, there is no proper party to assert the statutory privilege here.
¶ 60 Therefore, in addition, we hold that the trial court did not violate RCW 5.60.070 and did not err in admitting evidence of the two Bostwick mediations in the attorneys' dispute over fee-sharing in case before us.[10]

V. PREJUDGMENT INTEREST
¶ 61 Defendants Willingham and Goldstein argue that the trial court erred in awarding prejudgment interest on Hoglund's $40,000 award for breach of contract. This argument also fails.
¶ 62 Washington courts allow prejudgment interest only when a claim is liquidated. A liquidated claim is one "where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." Car Wash Enter., *50 Inc. v. Kampanos, 74 Wash.App. 537, 548-49, 874 P.2d 868 (1994), quoting King County v. Puget Sound Power & Light Co., 70 Wash. App. 58, 61, 852 P.2d 313, review denied, 122 Wash.2d 1017, 863 P.2d 1352 (1993). If, on the other hand, a fact finder using discretion in arriving at a judgment amount, then the award is unliquidated. Dautel v. Heritage Home Center, Inc., 89 Wash.App. 148, 153, 948 P.2d 397 (1997), review denied, 135 Wash.2d 1003, 959 P.2d 126 (1998).
¶ 63 Here, the trial court found that (1) Hoglund and Willingham had agreed that Hoglund was entitled to 80 percent of the contingent fee on the first $150,000 of the Bostwick settlement;[11] (2) the contingent attorney fee on $150,000 was $50,000; and (3) 80 percent of that attorney fee yielded $40,000 in attorney fees for Hoglund. The trial court exercised no discretion and engaged in no guesswork in computing this result. On the contrary, the trial court found a definitive contract and applied the terms of the contract to compute the amount of damages and to render the $40,000 judgment in favor of Hoglund.
¶ 64 We hold that the trial court used the contract's formula to arrive at a liquidated damages amount and, therefore, it appropriately awarded prejudgment interest to Hoglund.
¶ 65 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: BRIDGEWATER, J., and VAN DEREN, A.C.J.
NOTES
[1] Meanwhile, sometime in the autumn of 2003, the Washington State Bar revoked Graf's license to practice law.
[2] The trial court did not articulate its reason for finding that Wilhngham had apparent authority to contract for Goldstein.
[3] Although Hoglund and Meeks never had an explicit attorney fee-sharing agreement, the trial court found that Meeks' silence, knowing that Willingham and Hoglund had agreed to the base attorney-fee-sharing contract, constituted an implicit ratification of that contract. RP (June 9, 2006) 12-13. The following exchange took place between Meeks and the trial court:

MEEKS: But the question here is: Am I jointly and severally liable on a contract obligation in a contract that I have never entered? And he [Hoglund] says I didn't enter it. There's no finding that I entered a contract with that . . . if there was a contract  there was a relationship between Hoglund and the Goldstein firm. Hoglund left the position. They then hired me as the lead trial counsel. I didn't have anything to do with that contract.
THE COURT: I think your silence  your silence in this whole proceeding, in my mind, bounds you to that agreement. And I think I even said when I heard this case  might not have been legalese, but I think you just sucked in Mr. Hoglund. You remained silent and took advantage of his abilities and experience and work, and he is the one that structured all the biggest share by far, the material that was necessary to arrive at $850,000. And as far as I saw it, it was just unfortunate he did not go further to solidify his interest in the total settlement. . . . And you took advantage of him, and didn't pay him. And that's how simple it was.
[4] The trial court stated there was uncontradicted testimony that Willingham did not have actual authority to contract on behalf of Goldstein. Although we can affirm the trial court on any proper ground, we do not address whether Willingham had actual authority because: (1) Hoglund did not cross appeal this finding, and (2) it is unnecessary in light of our affirmance of the trial court's finding of apparent authority.
[5] See also King v. Riveland, 125 Wash.2d 500, 508-09, 886 P.2d 160 (1994) (authority to administer sex offender treatment program carries apparent authority to grant confidentiality to treatment participants); Pierson v. United States, 527 F.2d 459, 462-63 (9th Cir.1975) (authority to allow use of federal aircraft to one state employee created apparent authority to allow similar flights for other state employees).
[6] Goldstein attempts to analogize the situation here to Smith, where we held that an agent did not possess apparent authority when the agent was acting outside of his assigned role. 63 Wash.App. at 366, 818 P.2d 1127. In finding no apparent authority, we reasoned that hiring an agent as a manufacturing manager, as well as providing him with business cards and a phone extension, could not lead to an objectively reasonably belief that the agent was authorized to sell materials. Id. But the situation here is distinguishable. Unlike Smith, Goldstein allowed Willingham to control every aspect of the Bostwick litigation, and he did not limit her role or responsibility in any fashion. Thus, Goldstein communicated to third parties, through his tacit approval of Willingham's actions, that she had the authority to manage the Bostwick case in every respect.
[7] Hoglund proposes an alternative argument that, even if there was no authority, Goldstein ratified the contract between him (Hoglund) and Willingham. A principal ratifies an agent's agreement if the principal (1) receives, accepts, and retains benefits from the contract; (2) remains silent or fails to repudiate the contract; or (3) otherwise exhibits conduct demonstrating adoption and recognition of the contract. Barnes v. Treece, 15 Wash.App. 437, 443, 549 P.2d 1152 (1976). The record before us on appeal does not support this argument.
[8] See JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 2.8 (1993) ("parties may not give verbal expression to such vitally important matters as price . . . and yet they may actually have agreed upon them. This may be shown by their antecedent expressions, their past action and custom, and other circumstances.").
[9] Hoglund notes the irony in Meeks' raising this issue when Meeks had no written fee agreement with Bostwick and, thus, Meeks' only right to a contingent fee in the Bostwick litigation is based on the portion of the Bostwick settlement attributable to Meeks' services. Willingham and Meeks secured a $190,000 contingent fee, and the trial court specifically found that their work on the case was minimal. Thus, if a trial court actually divided up the fee according to the work each attorney performed, Meeks might owe Hoglund more than the $40,000 judgment at issue here.
[10] We further note that Defendants' reasoning would lead to problematic results, as the following hypothetical demonstrates: Upon receiving his $840,000 settlement after the mediation, Bostwick could have refused to pay any of his lawyers the fees to which they were entitled. Under Defendants' theory, if Meeks and Willingham had sued Bostwick to recover their fees, the statute would have excluded any testimony about the second mediation, which produced Bostwick's recovery and which represented the major portion of Meeks' work on the case. And without such testimony, neither Meeks nor Willingham would have been able to recover their attorney fees.

It has been a long-standing practice for plaintiffs' attorneys to earn their livelihood through contingent fees, frequently from negotiating settlements and participating in mediations. Reading RCW 5.60.070 to exclude the fact of settlement or mediation and agreed damages amounts would thwart these lawyers' ability to recover attorney fees. We cannot conceive that the Legislature intended such a result.
[11] The trial court found that the parties had not reached an agreement on any additional amounts.