IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| REAL MARKET DATA, LLC, a Washington State Limited Liability Company, | No. 83346-4-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| BLUE STONE ENTERTAINMENT, LLC, a Washington State Limited Liability Company, and ROY J. JOHNSON and MARY E. JOHNSON, husband and wife, | |
| Respondents. | |

CHUN, J. — Real Market Data, LLC sued Blue Stone Entertainment, LLC for breach of contract. Following a bench trial, the trial court accepted the interpretation of the contract advanced by Blue Stone and awarded Real Market Data only a fraction of the damages and attorney fees it sought. Real Market Data appeals. For the reasons below, we affirm.

## I.   BACKGROUND

Roy Johnson and Mary Johnson[1] owned a controlling share of Diamond Game Enterprises Inc. Diamond Game leased "Promotional Sweepstakes" game stations to two "entertainment centers" owned and operated by Ysleta del Sur Pueblo (Tribe) in Texas. To use the game stations, patrons make "charitable

---

[1] For clarity, in certain instances, we refer to Roy Johnson, Mark Witschger, and Bridget Witschger by their first names. We intend no disrespect.

Citations and pin cites are based on the Westlaw online version of the cited material.

donations," which help fund tribal programs like "health care, public safety, veterans' services, education, elder care, day care and after school programs." For each "donation," a patron can win "the Sweepstakes."

From 2011 to 2013, the Johnsons were in the process of selling Diamond Game to a larger gaming company, Amaya Americas. But a suit brought by the Texas Attorney General was pending against the Tribe and Diamond Game. Amaya refused to purchase Diamond Game unless it was protected from liability, which required Diamond Game to give up its Texas division.

On January 2, 2014, the Johnsons formed Blue Stone Entertainment, LLC to act as a "pass-through" or "intermediary between Diamond Game and the [T]ribe." Blue Stone would lease the game stations from Diamond Game and assume liability in the Texas litigation, and then Blue Stone would operate and maintain the game stations for the Tribe. Once Blue Stone was substituted for Diamond Game in the litigation, Amaya bought Diamond Game.

While working on the sale of Diamond Game to Amaya, Roy approached his neighbor and friend, Mark Witschger. Mark and his wife, Bridget Witschger, operated Real Market Data, LLC, a real estate data business. Roy asked Mark if Real Market Data could assist Blue Stone, and Mark agreed.[2]

---

[2] The parties dispute the type of assistance Mark rendered to Blue Stone. Blue Stone says it hired Mark to do part-time bookkeeping. Real Market Data says Mark did more than bookkeeping, and that he managed Blue Stone. Roy testified that he hired Mark to do "bookkeeping." Real Market Data's employee, Carol McCann, also testified that Mark did Blue Stone's bookkeeping. Bridget testified that Mark did "more than just bookkeeping." She said he did "[w]hatever Roy needed assistance with." And Mark testified that he had many responsibilities besides bookkeeping, such as running the business and dealing with attorneys.

The next day, Blue Stone and Real Market Data entered an "Independent Contractor Agreement." Section 3 of the agreement states, "In consideration of the Services provided during the Term, Blue Stone Entertainment LLC shall pay Contractor at a rate of 20% of *net revenue collected* under the promotional sweepstakes agreement (Exhibit A), paid on a bi-weekly basis commencing as of the Effective Date." (Emphasis added.)

On January 16, Blue Stone concurrently entered an "Equipment Lease Agreement" with Diamond Game and a "Promotional Sweepstakes Agreement" with the Tribe. Under the Equipment Lease Agreement, Blue Stone leased the stations from Diamond Game. Under the Promotional Sweepstakes Agreement, Blue Stone operated and maintained the stations for the Tribe.

The Equipment Lease Agreement provides that Diamond Game is the "Service Provider," and Blue Stone would pay Diamond Game "[a] service fee equal to five percent (5%) of Net Donations payable to Service Provider pursuant to the Service Agreement." Also, the agreement defines "Net Donations" as "the sum of all Sweepstakes donations made via the Donation Stations less sweepstake prize payouts paid in connection with the Donation Stations during the applicable period."

The Promotional Sweepstakes Agreement provides that Blue Stone was the "Operator." That agreement says, "(a) Tribe shall collect the total Net Donations made via the Donation Stations. As a 'Fee' for operating the promotional Sweepstakes and providing the related Equipment, Tribe shall pay to Operator an amount calculated as set forth in Exhibit A-1." Exhibit A-1 provides

3

that net donations are "[t]he sum of all Sweepstakes donations made via the Donation Stations less Sweepstakes prize payouts paid for each Donation Station during the applicable period." It also provides that the operator fee is "30% of Net Donations (fee for Operator's administration of the Sweepstakes and provision of Equipment)" and that "5% of Net Donations shall be payable by Operator from its Fee to Service Provider pursuant to the Service Agreement between Operator and Service Provider."

Blue Stone operated for about 22 months from 2014 to 2016.

Real Market Data sued Blue Stone for breach of contract. It alleged Blue Stone failed to pay it "20% of the net revenue" of the earnings from January 2014 to February 2017. Real Market Data alleged Blue Stone's net revenue was $5,282,122.08, but that Blue Stone paid Real Market Data only $127,233.57, about 2.4 percent. Real Market Data claimed it was entitled to the difference between 20 percent of what Blue Stone received ($5,282,122.08 x .20 = $1,056,424.42) and what it received ($127,233.57), which it calculated to be $929,190.84.[3]

The trial court interpreted "20% of net revenue" to mean "what money [Blue Stone] took in (which was 30% of the net donations) minus 5% payable to the service provider as well as the cost of leasing the machines." It also found that Roy received $586,541 from Blue Stone. Because Mark received $127,233.57, the court found that he received less than 20 percent of the "net profit" ($586,541 + $127,233.57 = $713,774.57; $127,233.57 / $713,774.57 =

_____

[3] We calculate $1,056,424.42 minus $127,233.57 to be $929,190.85.

0.178 or 17.8 percent).  To make up the difference between what he received and what Blue Stone owed, the court awarded Mark $15,520.34.  Blue Stone no longer exists and has no assets; the trial court determined the Johnsons were liable for that amount.

The court determined that because the court awarded Real Market Data $15,520.34 when it sought $929,190.84, it received .0167 of the amount it pursued.  The court determined Real Market Data was entitled to the proportional amount of attorney fees requested; because Real Market Data requested $95,525, the court awarded it $1,595.27.

Real Market Data moved for, and the trial court denied, reconsideration.  Real Market Data appeals.

## II.    ANALYSIS

### A. Independent Contractor Agreement – "Net Revenue"

We "follow the objective manifestation theory of contracts.  Under this approach, we attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst Commc'ns, Inc. v. Seattle Times, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).  "We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Id. at 504.

As for extrinsic evidence, our use of it is not limited to interpreting contracts with an ambiguous term. Berg v. Hudesman, 115 Wn.2d 657, 668–69, 802 P.2d 222 (1990).  We may look to the "surrounding circumstances and other

extrinsic evidence . . . 'to determine the meaning of specific words and terms used' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" Hearst Commc'ns, 154 Wn.2d at 503 (emphasis omitted) (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 695–96, 974 P.2d 836 (1999)).  Extrinsic evidence is not admissible as "'evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term.'" Go2Net, Inc. v. C I Host, Inc., 115 Wn. App. 73, 84, 60 P.3d 1245 (2003) (quoting Bort v. Parker, 110 Wn. App. 561, 574, 42 P.3d 980 (2002)).

"We review a trial court's decision following a bench trial by asking whether substantial evidence supports the trial court's findings of fact and whether those findings support the trial court's conclusions of law."  Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 712, 334 P.3d 116 (2014).  We review de novo the trial court's conclusions of law.  Id.

1.  Ordinary Meaning

"A contract term is ambiguous only when, viewed in context, two or more meanings are reasonable.  When multiple meanings are reasonable, which meaning reflects the parties' intent is a question of fact."  Healy v. Seattle Rugby, LLC, 15 Wn. App. 2d 539, 545, 476 P.3d 583 (2020) (citing GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 135, 317 P.3d 1074 (2014)).  When a contract term is undefined, we often turn to dictionary definitions to determine its ordinary meaning.  Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC, 18 Wn. App. 600, 611, 492 P.3d 843 (2021), pet. for review granted, No. 100168-1 (Wash. Jan. 5, 2022).  Typically, we use "standard English language

dictionaries." Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877, 784 P.2d 507 (1990).

Real Market Data assigns error to finding of fact 13, which states, "The term 'net revenue' from the Independent Contractor Agreement is not the 'net donations' as defined under the Promotional Sweepstakes Agreement and is more akin to 20% of the net profit of [Blue Stone] during the term of its operation of these 'donation stations.'"

Real Market Data and Blue Stone assert that the Independent Contractor Agreement's use of the "net revenue" is unambiguous but they interpret it differently. Real Market Data contends that "20% of net revenue" unambiguously is "20 percent of the money collected by Blue Stone from the Tribe under the promotional sweepstakes agreement," which means 20 percent of $5,282,122.08. Blue Stone contends it means that Real Market Data was only entitled to "20% of Blue Stone's profit—the operator fee minus expenses—and not 20% of the total operator fee" under the Promotional Sweepstakes Agreement. We conclude that the ordinary meaning supports the trial court's interpretation that net revenue is 20 percent of Blue Stone's revenue after deductions for expenses.

The Independent Contractor Agreement does not define "net revenue." It says Blue Stone will pay Real Market Data "20% of net revenue collected under the promotional sweepstakes agreement." "Net" is the amount of money "remaining after the deduction of all charges, outlay, or loss." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1519 (1993). "Revenue" is "the total income

7

produced by a given source." WEBSTER'S at 1942. Thus, "net revenue" is the total income from a given source remaining after deducting all charges. That definition matches the trial court's interpretation and conclusion that "net revenue" is "akin to 20% of the net profit of [Blue Stone] during the term of its operation of these 'donation stations,'" and that Real Market Data was entitled 20 percent of the total income from the Promotional Sweepstakes Agreement after any deductions for expenses.[4]

Given the foregoing, from an ordinary meaning perspective, Blue Stone advances a reasonable interpretation of "net revenue." And our analysis of the extrinsic evidence, set forth below through the lens of substantial evidence review, confirms that it advances the only reasonable interpretation.[5]

_____

[4] Blue Stone uses Black's Law Dictionary's definitions of "net," "revenue," and "profit." "Net" is "[t]he final amount remaining after all other amounts have been taken away; esp., an amount of money remaining after a sale, minus any deductions for expenses, commissions, and taxes." BLACK'S LAW DICTIONARY 1250 (11th ed. 2019). "Revenue" is "[i]ncome from any and all sources; gross income or gross receipts." BLACK'S at 1577. Combining those definitions, "net revenue" is the amount of income remaining after deductions for expenses. Also, Black's Law Dictionary lists the term "net revenue" as an example under its definition of the term "net profit," which it defines as the "[t]otal sales revenue less the cost of the goods sold and all additional expenses." It defines profit, by itself, as "[t]he excess of revenues over expenditures in a business transaction." BLACK'S at 1463. These definitions support the trial court's interpretation of the contract.

Real Market Data says that Blue Stone mistakenly interprets "net" and "revenue" separately because the term "net revenue" has its own definition. Real Market Data relies on QuickBooks' definitions of "net revenue" and "net profit." QuickBooks says that "Net revenue (or net sales) refers to money earned by your company during the course of doing business. . . . after subtracting things *like* sales discounts, returns, *etc.*" Katheryn Pomroy, What is net income and how does it affect your bottom line, Intuit QuickBooks: Resource Center (June 18, 2019) (emphasis added) https://quickbooks.intuit.com/r/revenue/understanding-top-bottom-line-difference-net-revenue-net-income/. But this definition, by using terms such as "like" and "etc.," is hardly definite. Nor does Real Market Data cite law supporting the use of QuickBooks to interpret this agreement.

[5] Real Market Data also cites F.T.C. v. Commerce Planet, Inc., 815 F.3d 593, 603 (9th Cir. 2016), which defines "net revenues" as "typically the amount consumers

8

2. Extrinsic Evidence

As discussed above, courts may look to the "surrounding circumstances and other extrinsic evidence . . . 'to determine the meaning of specific words and terms used' and not to 'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" Hearst Commc'ns, 154 Wn.2d at 503 (emphasis omitted) (quoting Hollis, 137 Wn.2d at 695–96). It is not admissible as evidence of one party's unilateral or subjective intent of the meaning of a contract term. Go2Net, 115 Wn. App. at 84. Extrinsic evidence may include:

> (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties.

Spectrum Glass Co., Inc. v. Pub. Util. Dist. No. 1 of Snohomish County, 129 Wn. App. 303, 311, 119 P.3d 854 (2005). Here, extrinsic evidence concerning the subsequent conduct of the parties and the reasonableness of their interpretations supports the trial court's interpretation of the agreement.

"When interpretation depends on factual determinations such as the credibility of extrinsic evidence or a choice among reasonable inferences to be drawn from extrinsic evidence, we review the fact finder's determinations of such matters for substantial evidence." Dave Johnson Ins., Inc. v. Wright, 167 Wn.

---

paid for the product or service minus refunds and chargebacks." But that case does not apply as it concerns the calculation of "unjust gains" in the context of determining a restitution award for a violation of the Federal Trade Commission Act (FTCA), 15 U.S.C.A. § 45, and has nothing to do with contract interpretation.

9

App. 758, 769, 275 P.3d 339 (2012) (citing Berg, 115 Wn2d at 668). "Substantial

evidence is evidence sufficient to persuade a fair-minded, rational person of the

truth of the finding. On appeal, we view the evidence in the light most favorable

to the prevailing party." Weyerhaeuser v. Tacoma-Pierce County Health Dep't,

123 Wn. App. 59, 65, 96 P.3d 460 (2004) (citation omitted) (citing Pilcher v. State

Dep't of Revenue, 112 Wn. App. 428, 435, 49 P.3d 947 (2002)). We also defer

to the trier of fact on witness credibility or conflicting testimony. Id.

> i. Subsequent Conduct of Parties

Real Market Data assigns error to finding of fact 10, which states,

> The accounting and payments out of [Blue Stone] to Mr. Johnson and Mr. Witschger are much more consistent with the intent to split net profits 80% to Mr. Johnson and 20% to Mr. Witschger. Also, the conduct in payout during the term of the 22 months of operation of this arrangement once again favors the defendant [Blue Stone]'s interpretation of net revenue.

Substantial evidence supports this finding, which supports the trial court's

interpretation of the agreement.

Roy testified that he and Mark agreed to "split the net profits 80/20 and

that's how it was done over the course of the 22 months." Roy also testified that

during that period Mark paid himself 20 percent of Blue Stone's income after Blue

Stone paid the operating costs without complaint. Real Market Data presented

conflicting evidence at trial, but the standard of review here is substantial

evidence, and we cannot reweigh the evidence considered by the trial court. See

Bale v. Allison, 173 Wn. App. 435, 458, 294 P.3d 789 (2013) ("We do not

10

reweigh or rebalance competing testimony and inferences even if we may have resolved the factual dispute differently.").

ii.    Reasonableness of Interpretations

Next, substantial evidence supports the trial court's finding essentially that Blue Stone advanced the only reasonable interpretation of the agreement.

Blue Stone received $5,282,122.08 in apparently gross revenue (i.e., before deductions for expenses).  The trial court calculated the "net revenue" to be the total of payments to Roy and Mark.  Roy received $586,541 and Mark received $127,233.57.  Together, Roy and Mark received $713,774.57.[6]

At trial, Real Market Data claimed that the $5,282,092.08 figure was Blue Stone's net revenue and that it was entitled to 20 percent of it, or about $1 million.  Under such an interpretation of the agreement, Blue Stone would operate at a loss and Roy would receive nothing.

And indeed, Roy testified that under Mark's interpretation of the Independent Contractor Agreement, Blue Stone would have operated at a loss — an agreement he said he would not have entered "unless my mental faculty was damaged."[7]  Roy testified that he hired Mark to do "bookkeeping."  And Real Market Data's employee, Carol McCann, testified that Mark did Blue Stone's

---

[6] Blue Stone asserts that its total profit from the 22 months it operated was $601,323.48.

[7] Contract interpretation should not produce an absurd result.  Eurick v. Pemco Ins. Co., 108 Wn.2d 338, 341, 738 P.2d 251 (1987) ("The contract must be read as the average person would read it; it should be given a 'practical and reasonable rather than a literal interpretation', and not a 'strained or forced construction' leading to absurd results." (quoting E-Z Loader boat Trailers, Inc. v. Travelers Indem. Co., 106 Wn.2d 901, 907, 726 P.2d 439 (1986))).

bookkeeping.  Real Market Data points to evidence that Mark did more than bookkeeping for Blue Stone; but again, we do not reweigh the evidence presented to the trial court.  Given the foregoing, substantial evidence supports the trial court's finding on the reasonableness of Blue Stone's interpretation.

As substantial evidence supports the trial court's findings on the parties' subsequent conduct and the reasonableness of Blue Stone's interpretation of the agreement, and those findings support the trial court's conclusions, the court did not err.[8]

B.  Attorney Fees

1.  Trial Court Fee Award

Real Market Data contends the trial court abused its discretion by misapplying the proportionality method instead of the lodestar method to

---

[8] Real Market Data claims that the trial court misused extrinsic evidence; for example, by using it to determine subjective intent.  But we may affirm on any ground supported by the record.  Deep Water Brewing, LLC v. Fairway Res., Ltd., 170 Wn. App. 1, 11, 282 P.3d 146 (2012).

Also, Real Market Data assigns error to finding of fact 3.  It says the finding contains typographical errors and thus does not accurately quote the provision at issue in the Independent Contractor Agreement.  The finding states,

> On January 3, 2014, Defendant BLUESTONE ENTERTAINMENT, LLC, and Plaintiff entered into an independent contractor agreement wherein the Parties expressly agreed that for the consideration "at *the* rate of *twenty percent (20%) of the* net revenue collected*,* under the promotional sweepstakes agreement paid on a bi-weekly basis commencing as of the effective date."

(Emphasis added.)  The Independent Contractor Agreement states,

> Blue Stone Entertainment LLC shall pay Contractor at *a* rate of *20% of* net revenue collected under the promotional sweepstakes agreement (Exhibit A), paid on a bi-weekly basis commencing as of the *E*ffective *D*ate.

(Emphasis added.)  The variances between the quoted text in the finding and the Independent Contractor Agreement are slight and do not call into question the trial court's reasoning.  Nor do they do not affect our interpretation of the Independent Contractor Agreement, which is based on the contract language itself.

calculate attorney fees. We disagree.

"An attorney fee award made pursuant to a contract may be reversed only if the trial court manifestly abused its discretion." Cornish College of the Arts v. 1000 Virginia Ltd. Partnership, 158 Wn. App. 203, 231, 242 P.3d 1 (2010). A trial court abuses its discretion when the court exercises it on untenable grounds or for untenable reasons. Berryman v. Metcalf, 177 Wn. App. 644, 657, 312 P.3d 745 (2013). "A discretionary decision rests on 'untenable grounds' or is based on 'untenable reasons' if the trial court relies on unsupported facts or applies the wrong legal standard." Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

"A determination of reasonable attorney fees begins with a calculation of the 'lodestar,' which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Berryman, 177 Wn. App. at 660. But "[t]he 'lodestar' is only the starting point, and the fee thus calculated is not necessarily a 'reasonable' fee. In assessing the reasonableness of a fee request, a 'vital' consideration is 'the size of the amount in dispute in relation to the fees requested.'" Id. (citation omitted) (quoting Scott Fetzer Co. v. Weeks, 122 Wn.2d 141, 150–51, 859 P.2d 1210 (1993)). "A lodestar calculation that grossly exceeds the amount in controversy should suggest a downward adjustment." ADA Motors, Inc. v. Butler, 7 Wn. App. 2d 53, 68, 432 P.3d 445 (2018). "For purposes of proportionality analysis, the amount in controversy necessarily requires consideration of the actual amount recovered on a claim." Id.

13

Section 26 of the Independent Contractor Agreement provides a basis for awarding attorney fees:

> If any legal action, or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which the prevailing party may be entitled.

Generally, "a prevailing party is one who receives an affirmative judgment in its favor." Cornish College, 158 Wn. App. at 231.

Real Market Data contends the trial court committed an error of law, and therefore abused its discretion, by applying the proportionality approach instead of the lodestar method. But the lodestar method is just the starting point and may be adjusted to award a reasonable fee. Berryman, 177 Wn. App. at 660.

The trial court determined that Blue Stone prevailed on the contract interpretation issue, but Real Market Data still obtained a judgment of $15,520.34. The trial court considered that it awarded Real Market Data .0167 (or 1.67 percent) of the amount the company pursued. Using the "spirit of a proportionality approach," the court determined that Real Market Data was entitled to the proportional amount of attorney fees requested; because it requested $95,525, the court awarded it $1,595.27.

While the lodestar method is generally the starting point for an award of attorney fees, trial courts have discretion to deviate from it and apply the proportionality method. Thus, the trial court did not abuse its discretion in applying the proportionality method.

14

2.  Appellate Fees

Real Market Data and Blue Stone request attorney fees on appeal under the Independent Contractor Agreement and RAP 18.1.  RAP 18.1(a) provides, "If applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or Supreme Court, the party must request the fees or expenses as provided in this rule."  Blue Stone is the prevailing party on appeal, and is entitled to attorney fees under the Independent Contractor Agreement, subject to its compliance with RAP 18.1.

We affirm.

_Chun, J._

WE CONCUR:

_Coburn, J._      _Bowman, J._

15